OF THE

## STATE OF NEW JERSEY.

## ON APPEAL FROM THE COURT OF CHANCERY,

### AND PREROGATIVE COURT.

JUNE TERM, 1885.

———————

WASHINGTON B. WILLIAMS, receiver &c., appellant,

*v.*

HUGH W. McKAY et al., respondents.

1. The managers of a savings bank stand in the relationship of trustees to the depositors, so that the statute of limitations will not be a bar against a charge of mismanagement on their part, which had occurred more than six years before the filing of the bill.

2. Although such managers are unpaid, they are to be held liab'e for the want of ordinary care and diligence in the management of the affairs of the institution.

189

3. When the bill shows a long and systematic violation of the directions of the charter, by the president and committeemen, it is a *prima facie* presumption that such course of misconduct was known to the managers, and the latter cannot demur to the bill on the ground that such misconduct is not traced to them.

---

On appeal from a decree of the chancellor, whose opinion is reported in *Williams* v. *Halliard, 11 Stew. Eq. 373.*

The Mechanics and Laborers Savings Bank was incorporated by a public statute passed March 3d, 1869. Its franchise was to receive deposits of money to be held, used and improved to the best advantage, and to divide the income and profit thereof among the persons making the deposits in just proportion after deducting necessary expenses, and to repay them the principal sums so deposited at such times, with such interest, and under such regulations as the managers should prescribe. Fifteen persons were named in the act as the corporators or first managers; by a supplement this number was increased to twenty-four. The tenth section was as follows:

"That said corporation shall invest no money in any public stock, other than such as are erected under the laws of the United States, or the state of New Jersey, New York, or in the public stocks of Jersey City or Newark, in this state, or of the cities of New York or Brooklyn, in the state of New York, authorized by the laws of said states respectively, nor on bond and mortgage except on real estate worth at least double the amount of the sum invested, above all encumbrances, nor in the stock of any incorporated company whatever."

The managers were empowered to appoint their successors, and the charter provided that the president, vice-president, treasurer and other officers of the bank should give security for their fidelity and good conduct as the board of managers might, from time to time, require. The officers constituted by the by-laws were a president, vice-president, secretary and treasurer, and a finance and executive committee of three members each, together with the president and vice-president. These officers

Williams v. McKay.

were to be annually selected from among themselves.  Among the by-laws were the following, viz. :

"1. The officers of the board are a president, vice-president, secretary and treasurer, a finance committee, and an executive committee of three members each, together with the president and vice-president, who shall be members of said committees *ex officio*.

"2. All the said officers and committees shall be elected by ballot, from the board of managers, annually, at the regular meeting on the second Monday in November in each year.  Any of them may be removed by a two-thirds vote of the board, and vacancies filled at any other stated or special meeting.

"6. The order of business of the board shall be as follows:

"1st. Reading minutes of last regular meeting and of any subsequent meeting of the board.

"2d. Reading minutes of finance committee and passing upon their rules and recommendations.

"3d. Reports of special committees.

"4th. Treasurer's report and general statement.

"5th. Motions, suggestions and remarks upon the business investments of the bank, present or prospective, and condition of its affairs.

"6th. Unfinished business.

"7th. New business.

"10th. It shall be the duty of the finance committee to attend to all applications for loans, and they shall meet as occasion may require for the purpose of investing and loaning the funds, and for other purposes connected with their trusts.

"11th. The executive committee shall have the general charge and government of the bank, and, from time to time, lay down rules not inconsistent with the orders of the board, or the by-laws, which shall be binding until the next meeting of the board, when, if approved by the board, they shall be of permanent obligation until revoked by the board.

"It shall be their duty to examine the books, accounts and securities of the bank, and at the regular meetings of the board in May and November in each year, to declare the rate of interest to be paid depositors for the preceding six months, and report to the board to be confirmed or rejected.

"16th. On the third Monday in May and November in each year, there shall be paid such interest as in the judgment of the board the business of the bank for the last six months will justify, to be allowed as follows:

"On sums on deposit for six months next preceding May 1st and November 1st, six (6) months' interest, and no more; on other sums on deposit for three months or more prior to either of those days, three months' interest, and no more.  All deposits received between the 1st and 25th of each February, May, August and November shall be entitled to and receive interest from the first of said months respectively.

"20th. Deposits may be made in said bank, to be returned on demand, where no interest is to be paid to the depositor."

The bank began business in 1869, and suspended on the 1st of November, 1878. A receiver was appointed under proceedings in insolvency on March 7th, 1879. The charter required the managers to meet semi-annually. Many of the defendants served on both the executive and finance committees; some served on only one, and some on neither. The official connection of some of the defendants terminated more than six years before this suit was brought.

The neglects and misconduct on the part of the defendants which are relied on as a ground for relief, will be found stated in the opinion.

*Mr. W. B. Williams, pro se,* cited:

*Citizens Association* v. *Coriell,* 7 *Stew. Eq. 383 ; Williams* v. *Reilly,* 7 *Stew. Eq. 398 ; P. L. of 1869 p. 177 ; Charitable Corporation* v. *Sutton,* 2 *Atk. 400 ; Scott* v. *Depeyster,* 1 *Edw. Ch. 533 ; Citizens Association* v. *Lyon,* 2 *Stew. Eq. 110 ; Hun* v. *Cary,* 82 *N. Y. 65 ; Quick* v. *Fisher,* 1 *Stock. 802 ; Thomp. on Liability of Directors p. 377 and cases cited.*

*Mr. A. Q. Garretson,* for Kelly and Meehan, cited:

*P. L. of 1869 p. 178 § 3 ; Joint Stock Discount Co.* v. *Brown, L. R. (8 Eq.) 381 ; Land Credit Co.* v. *Fermoy, L. R. (5 Ch. App.) 763 ; Ashhurst* v. *Mason, L. R. (20 Eq.) 225 ; Cargill* v. *Bower, L. R. (10 Ch. Div.) 502 ; Wanmaker* v. *Van Buskirk, Sax. 691 ; Partridge* v. *Wells,* 3 *Stew. Eq. 176 ; Marsh* v. *Oliver,* 1 *McCart. 259 ; McClane* v. *Shepherd,* 6 *C. E. Gr. 76 ; Stockton* v. *M. & L. Savings Bank,* 5 *Stew. Eq. 164 ; Chester* v. *Halliard,* 9 *Stew. Eq. 316 ; People* v. *Mechanics and Traders Savings Institution,* 92 *N. Y. 9 ; Hun* v. *Cary et al.,* 82 *N. Y. 65 ; Spering's Appeal,* 71 *Pa. St. 11 ; Wood on Limitations of Action 413 ; Kane* v. *Bloodgood,* 7 *Johns. Ch. 90 ; Farnam* v. *Brooks,* 9 *Pick. 246 ; People* v. *Kelly,* 35 *Barb. 455.*

*Mr. Peter Bentley*, for Patrick Reilly, Robert Smyth and John Murphy, cited:

*Thomp. on Liability of Officers &c. of Corporations 357; Spering's Appeal, 71 Pa. St. 11; Thomp. on Liability 233; McClane's Admr. v. Shepherd's Exr., 6 C. E. Gr. 79; Barnes v. Taylor, 12 C. E. Gr. 265; Partridge v. Wells, 3 Stew. Eq. 176; Freeholders of Somerset v. Veghte, 15 Vr. 509; Chester v. Halliard, 9 Stew. Eq. 316; Hannon v. Williams, 7 Stew. Eq. 259; Charitable Corporations v. Sutton, 2 Atk. 400; Ackerman v. Halsey, 10 Stew. Eq. 356.*

*Mr. Wm. A. Lewis*, for Patrick Farrelly, cited:

*P. L. of 1869 p. 177 &c.; P. L. of 1871 p. 1326; P. L. of 1873 p. 1300; Marselis v. Morris Canal Co., Sax. 31, 38; Crane v. Fairchild, 1 McCart. 76; Story's Eq. Pl. §§ 271, 530–539; Citizens Building Association v. Coriell, 7 Stew. Eq. 383, 392; Ackerman v. Halsey, 10 Stew. Eq. 356; Spering's Appeal, 71 Pa. St. 11.*

*Mr. James B. Vredenburgh*, for James Keary, cited:

*Lewin on Law of Trusts p. 739; Perry on Trusts p. 782 § 862; Bishop v. Little, 3 Me. 405; Farnam v. Brooks, 9 Pick. 212, 244; Greene v. Nixon, 23 Beav. 535; Chester v. Halliard, 9 Stew. Eq. 313; Marsh v. Oliver, 1 McCart. 259; Hovenden on Trusts p. 477; Clarke v. Boorman, 18 Wall. 509; Stache v. Stache, 3 Rich. 438; Angell on Lim. p. 581 § 472, and note; Harwood v. Oglander, 6 Ves. 199; Spering's Appeal, 71 Pa. St. 11.*

*Messrs. Collins & Corbin*, for nine respondents, cited:

*Overend & Gurney Co. v. Gibb, 5 H. L. 480; Land Credit Co. v. Fermoy, L. R. (5 Ch. App.) 763; In re Denham, L. R. (25 Ch. Div.) 752; Joint Stock Discount Co. v. Brown, L. R. (8 Eq. Cas.) 381, 401; Ashhurst v. Mason, L. R. (20 Eq.) 225;*

*Cargill* v. *Bower*, *L. R.* (*10 Ch. Div.*) *502* ; *Weir* v. *Barnett*, *L. R.* (*3 Ex. Div.*) *32* ; *Hun* v. *Cary*, *59 How. Pr. 426, 439*, *affirmed*, *82 N. Y. 65* ; *Adair* v. *Brimmer*, *74 N. Y. 539, 567* ; *In re Forest Co.*, *L. R.* (*10 Ch. Div.*) *450* ; *In re Wincham Co.*, *L. R.* (*9 Ch. Div.*) *329* ; *Sturges* v. *Vanderbilt*, *73 N. Y. 384* ; *Ackerman* v. *Halsey*, *N. J. L. J.*, *Nov.*, *1883*, *p. 311* ; *Robinson* v. *Smith*, *3 Paige 222* ; *Brinkerhoff* v. *Bostwick*, *88 N. Y. 52* ; *Spring* v. *Smith*, *21 Pa. St.* ; *Booth* v. *Robinson*, *55 Md. 419*, *437, 438* ; *Dunn* v. *Kyle*, *14 Bush 134* ; *Conway* v. *Halsey*, *15 Vr. 462* ; *Chester* v. *Halliard*, *9 Stew. Eq. 313, 316* ; *People* v. *Mechanics and Traders Bank*, *92 N. Y. 7* ; *Knox* v. *Gye*, *L. R.* (*5 H. L.*) *656, 674* ; *Farnam* v. *Brooks*, *9 Pick. 242* ; *McClane* v. *Shepherd*, *6 C. E. Gr. 76, 80* ; *Partridge* v. *Wells*, *3 Stew. Eq. 176, 179*, *affirmed*, *4 Stew. Eq. 362* ; *Ship* v. *Crosskill*, *L. R.* (*10 Eq.*) *73, 83* ; *Peebles* v. *Green*, *6 Lea* (*Tenn.*) *471* ; *Renwick* v. *Renwick*, *1 Bradw.* (*Ill. App.*) *234* ; *Bay City Bridge Co.* v. *Van Etten*, *36 Mich. 210*.

The opinion of the court was delivered by

BEASLEY, C. J.

This bill was exhibited by the receiver of the Mechanics and Laborers Savings Bank against its managers, for the purpose of holding them liable for certain losses sustained by the institution from time to time through a series of years. The right to the relief prayed is based on the alleged negligence of these officers in the management of the corporate affairs.

The bill, which is somewhat loosely framed, contains, in substance, a statement, which is mainly substantiated by details, of official delinquencies in the following particulars, viz. : first, in the investment of moneys in a large number of specified instances on insufficient landed security, and in violation of the charter of the company ; second, in the loaning of other moneys on mere personal security ; third, in permitting the president of the bank, one John Halliard, to withdraw, without giving adequate security,

Williams v. McKay.

and to apply to his own use, the funds of the bank; and fourth, in the failure to require the president to give bond for the faithful performance of his official duties.

The question before this court is whether the decree appealed from is to be sustained which holds that these charges, as stated in the bill, do not lay any ground of equity in the complainant.

Viewed in its general aspect, the equitable rule which is applicable to persons holding official positions such as were held by these defendants, is not in doubt. The duty belonging to such a situation is a plain one—to care for the moneys intrusted to them in the manner provided in the charter, and to exercise ordinary care and prudence in so doing. It is true that the defendants were unpaid servants, but the duty of bringing to their office ordinary skill and vigilance was none the less on that account, for to this extent there is no distinction known to the law between a volunteer and a salaried agent. These defendants held themselves out to the public as the managers of this bank, and by so doing they severally engaged to carry it on in the same way that men of common prudence and skill conduct a similar business for themselves. This is the measure of the responsibility of officers of this kind.

Nor do I find anything in the charter now before us that curtails or limits the responsibility thus defined. There appears to be neither provision nor expression in this law that indicates a legislative intention to absolve any of these managers from the duties and responsibilities generally inherent in the office filled by them. The charter required the defendants to meet at least twice a year as a board of managers, and such regulation was almost entirely useless unless on such occasions it was their duty to supervise the conduct of their committees, and to look generally into the affairs of the company. There is no ground for the belief that it was the intention of the legislature that none but such managers as acted on committees, should have the charge of the affairs of this bank. The only guaranty given to depositors consisted in the reputation of its managers with respect to probity and fiscal ability, and such guaranty was a mere

snare if more than two-thirds of such officers were to have no substantial part in the management. Doubtless such officers had the right to rely in many respects on the skill and diligence of their committeemen, and if, exercising a reasonable circumspection, they were unaware of the misconduct or neglects of such agents, they would not be responsible for the consequences. But so plain was their duty to oversee the business done by such committeemen that, it seems to me, they are chargeable, *prima facie*, with a knowledge of what was doing or had been done in all important matters by such bodies. That they themselves thought this duty of general supervision was incumbent upon them, is perfectly manifest from the entire tenor of the by-law prescribing the conduct of business at the semi-annual meetings, and providing that at such times should be read the reports of the treasurer and committees, and of the minutes of the finance committee. From these considerations I think it must be conceded that these officers had no special dispensation from the exercise of that degree of care and vigilance that the law generally exacts of persons holding similar positions.

Nor can I yield to the plea that is so much pressed in the briefs of counsel, that most of the neglects and misfeasances charged in this bill are of such long standing that they are shielded from inquiry by the statute of limitations. After careful examination, my clear conviction is that the statute in question has no place in this proceeding.

It is a mistake, sure to mislead, to regard this suit as one solely in right of the insolvent corporation. It does not rest upon that narrow footing, for the receiver represents not only the corporate body, but likewise the depositors and creditors; and the question which presents itself, therefore, is as to the *status* of the managers with reference to the latter two classes of persons; and as to them, I entertain no doubt whatever that these officers must respond to them in the character of their trustees. In reaching this conclusion, the principle so often stated in the decisions and text-books is in nowise controverted, that a trust, to be exempt from the operation of the statute of

limitations, must be of a nature to stand the triple test, viz.: first, it must be a direct trust; second, it must be of a kind belonging exclusively to the jurisdiction of a court of equity; and, third, the question must arise between the trustee and the *cestui que trust*. And in each of these respects, the present case harmonizes with the standard. If it is a trust at all, it certainly is a direct one, for it arises immediately upon the placing of the funds under the control of this body of officers. Such a transaction has nothing of the nature or qualities of those indirect trusts that require, for their creation, a decree of a court of chancery, as, for example, where money, under certain circumstances, has been fraudulently secreted, and a decree in equity will ofttimes convert it into a trust. It is admitted, on all sides, that depositors in one of these banks acquire, *ipso facto*, an equitable right, which, by taking a certain course, they can put in force against the directors or managers, if they have sustained a loss by reason of the misfeasance of such officers; and if such a right exist, what is it, if not the right of a *cestui que trust* against his trustee? This right, thus referred to, is, very plainly, not a right inherent in a contract, for a depositor pays his money to the corporation, and makes no bargain with the managers. And yet the law indisputably establishes an equitable right in his favor from the naked fact of his relationship with this class of officers. And it would be singular, indeed, if the law did not raise up a trust out of such a connection. The affair between the depositor and the managers embraces all the materials out of which trusts are created, for I know of no reason why the transactions denominated trusts have been invested by law with their peculiar qualities and characteristics, except that the property that they embrace is put, by way of confidence, under the absolute control of the person called the trustee, and that the person in whose favor it is so placed cannot enforce or protect his interest in a court of law. And this in all respects is the situation when a man places his money in one of these banks; the transfer of such money is nominally to the corporation, but with the intent to put it under the unsupervised control of the managers, in

whose appointment the depositor takes no part, his sole reliance being in the honesty and general trustworthiness of such officers, and such an affair, as it admittedly creates an equitable right on the one side, and a correlative obligation on the other, necessarily establishes a direct trust. It will be also observed that the transaction exhibits the second and third requisites of a trust, inasmuch as the right of the depositor to look to the managers for reparation when a loss has been occasioned by their default, is an equitable one, cognizable only in a court of conscience, and the present proceeding is between the trustee and the legal representative of the *cestuis que trustent*. And upon this subject the court of appeals of New York, in the case of *Hun v. Cary, 82 N. Y. 65*, decides that the relation between a savings bank and its directors is that of principal and agent, and the relation between its directors and depositors is similar to that of trustee and *cestui que trust*. Nor is a contrary view upon this subject expressed by the supreme court of Pennsylvania in *Spering's Appeal, 71 Pa. St. 11*, and which is a decision much relied on by the counsel of some of the defendants. The only pertinent point decided in that case is that the statute of limitations began to run in favor of a director as soon as he vacated his office, but in so deciding the court was careful to say that the case before it was one between the stockholders and directors, and not one between the latter class of officers and creditors or depositors. With respect to the effect of the statute upon the doings of the officers so long as they continued in office, the court expressly refused to express an opinion upon the question. It is obvious, therefore, that this case has but small pertinency to the present inquiry.

And looking upon the present controversy as growing out of a trusteeship, it seems to me incompatible with such a conclusion to hold that the statute in question will begin to run upon the vacation of his office by the manager, because such act has not changed the essential nature of the transaction, for the right of the depositor remains, as before, a purely equitable one, which he cannot enforce in a court of common law. And it is the accrual of the right of action at law which calls the statute, by force of

Williams v. McKay.

its own terms, into play. Lapse of time, therefore, is not an absolute bar to an equity of this nature, but lapse of time is often a strong, and sometimes a conclusive, circumstance in the administration of the law of equity. Sir John Romilly, sitting as master of the rolls, in the case of *Williams* v. *Page, 24 Beav. 654, 661*, in which a bill had been filed in behalf of shareholders against the managers of a railway company, places this subject in what I deem its true light. He says: " The managing committee of a projected railway company are, as well as the directors of the company after its formation, not the mere agents of the stockholders, but their *trustees,* and liable to account as such. The trust, no doubt, is a peculiar one, but such as it is they have undertaken to discharge the duties of it, and they must be responsible for the due performance of them. In my opinion all principle and all authority point one way on this subject, and I should consider myself wasting public time by enunciating and enforcing elementary principles, which are familiar to every one cognizant of legal matters, if I were to enlarge upon this subject. Still, the nature of the trust is such that I should consider time, although not a bar by statute, a very material ingredient in such a transaction, and, having regard to the discretion which courts of equity have always exercised upon this subject, and which, in part, forms an important branch of equity itself, I should think a court of equity would refuse relief to stockholders, and decline to decree such general account against persons so situated, who had, three or four years before, rendered their accounts, divided the money in their hands, and this without meeting with any comment or remonstrance on the part of the shareholders." It will be observed, from this extract, that the distinguished Master of the Rolls treats, as a matter entirely settled, the relationship of the directors to the shareholders as constituting the former a trustee, and declares that to the equities arising between them the statute of limitations is not applicable as a bar.

In the light of the principles thus enunciated, let us then look at the substantial statements of this bill, with a view to ascertain whether they do not show a delinquency in official duty, which,

if admitted, will establish the liability of these managers, as claimed by the receiver.

I will first turn my attention to the loans alleged to have been made on personal security.

The bill states, specifically, the names of a number of persons to whom such loans, on mere personal security, were made, giving the amounts and dates of the notes so taken. These transactions covered the entire period of the business of the bank until it was closed by the court of chancery under the insolvency proceeding. The notes thus designated were uncollectible, on account of the pecuniary irresponsibility of the makers of them. There is a further charge that John Halliard, the president, between the years 1872 and 1878, both inclusive, withdrew from the funds of the bank, on his own checks or notes, various sums of money, amounting to over $11,000, and that, in the year 1872, he withdrew and applied to his own use the further sum of $20,000, to secure which he subsequently gave a mortgage, which was not solid security. The bill states that this last transaction took place without the knowledge of the managers, at the time it occurred.

The chancellor, in his opinion, says, and I think the view is altogether indisputable, " that the provisions and restrictions of the charter must be regarded as clear evidence of the design of the legislature to prohibit the investment of the funds of the bank on personal security merely, and especially without any security at all. The intention is all the more manifest when the nature of the institution is considered—that it was a savings bank, designed to benefit the public by acting as the custodian of the savings of persons of small means, to invest them safely for the advantage of the depositors."

Here, then, is presented a clear and palpable violation of duty on the part of these managers or some of them. The inquiry therefore arises, Do not these statements of the bill show, until explained, a responsibility in all the defendants for the losses thus arising?

The argument upon this point, in favor of these defendants,

Williams v. McKay.

was two-fold—first, that all but an inconsiderable portion of these investments was barred by the statute of limitations; but we have seen that such position is untenable; and, in the second place, it was urged that it was only the committeemen who made these loans who were the responsible parties. But this latter position is, I think, as untenable as the former. These illegal loans ran through a long period of years, and represented large sums of money; and it is perfectly obvious that it was the settled practice, in this business, to make them in this form, and it is, consequently, an inference absolutely necessary, from the facts as presented, that the managers, as a body, knew of such practice. If, during the long continuance of this practice, these officers never discovered its existence or knew that their president, from time to time, drew out of the bank, on his own checks and notes, these large sums of money, it seems to me that, *prima facie*, such want of knowledge would be, of itself, and until explained, very clear proof of gross negligence on their part. It does not seem to me that it was possible that these officials, if they faithfully discharged the functions of their office, could have failed to become acquainted with these transactions, and I have no idea that it is the business of this court to draw improbable deductions from the statements of this bill, in order to shield these defendants from answering it. And I entirely repudiate the notion that this board of managers could leave the entire affairs of this bank to certain committeemen and, then, when disaster to the innocent and helpless *cestuis que trustent* ensued, stifle all complaints of their neglects, by saying, We did not do these things, and we know nothing about them. Plainly, such was not the opinion of Lord Hardwicke, when, in the case of *Charitable Corporation* v. *Sutton, 2 Atk. 400,* he said: "Committeemen are most properly agents to those who employ them in the trust, and who empower them to superintend and direct the affairs of the corporation. If some persons are guilty of gross negligence, and leave the management entirely to others, they may be guilty by this means of the breaches of trust that are committed by others." As matters are now present before

this court, I think these defendants must be charged with knowledge of the systematic doing of these illegal acts.

And in the next place, in my opinion, the same inference must obtain, for present purposes, with respect to that long series of improper and illegal loans alleged to have been secured by mortgages on property of insufficient value. Many of these instances show a gross neglect of duty by the officers of the bank, and constitute very flagrant violations of the requirements of the charter. It may be that these transactions were kept by the committeemen engaged in them from the knowledge of the other managers, but, as the facts now appear, there can be no such inference in their exoneration. The misconduct in question was manifested in frequent, glaring instances, and it is not easy to imagine how they, or some of them, failed to be discovered by these boards of managers on the supposition which, in their favor the law will make, that they exercised their office in this respect with a reasonable degree of vigilance. The neglectful acts in question cannot be regarded by the court as isolated instances, for they run through the whole period of the life of this institution, and thus evince a systematic and habitual disregard of the directions of the company's charter, and a very striking indifference with regard to the security of the money held in trust by them. The remarks of Lord Hatherly, in deciding the case of *Land Credit Company of Ireland* v. *Lord Fermoy, in L. R., (5 Chan. App.) 763, 770*, are so pertinent to this subject, and, as I think, so clearly define the legal rule that in such cases should be applied, that I deem it well to quote them at length. " I am exceedingly reluctant," says that eminent chancellor, " in any way to exonerate directors from performing their duties, and I quite agree that it is their duty to be awake, and that their being asleep would not exempt them from the consequences of not attending to the business of the company. It appears that under the trust deed they had the power of making loans, and the power of appointing a committee to whom they might delegate all the power they thought proper, and that, in fact, a committee was appointed,

Williams *v.* McKay.

called the executive committee, and that the functions of the directors were transferred to this committee, so far as regarded proposals for business and for loans and other matters. The committee from time to time reported to the directors, and the directors had a right to ask proper questions, and to decide thereon according to their discretion; and the directors must be tried as any other trustees accused of neglecting their duties." Resorting to these principles as properly applicable to the situation of affairs as made apparent on the face of this bill, it does not seem reasonable to declare that the defendants in the present case are not sufficiently inculpated to require them to answer, for it is the rational conclusion that unless they were, according to the expression of the English chancellor, "asleep," they must have become aware of these long-continued infractions of duty on the part of their committees. In both these respects, that is, on the subjects of these illegal loans on mere personal security and on scanty real estate, an answer is due from these officers.

The last objection to this bill is that it is multifarious.

Two grounds in support of the point are insisted on—first, that it charges upon these defendants, as a body, acts of negligence in all of which each of them could not have participated, and in the second place, that it sets up against one Patrick Reilly certain violations of duty in his character of treasurer, in which he was alone involved.

Neither of these positions is well taken. It has already appeared in the foregoing discussion that the fundamental charge against these boards of managers was that, from their neglects, certain committees and other officers were enabled to violate the law under which they were acting, and that thus the losses in question had been occasioned to this company. To declare that the complainant, in a case of this nature, must *in limine* show the mode and time of the participation of each individual officer in the particular instances of misconduct specified, would be, in point of fact, to declare that the complainant was not entitled to a practicable remedy. It is only after answers and evidence,

and on the final hearing, that the connection of the several defendants with the transactions in question, and the measure of the responsibility of each defendant, can be ascertained and established. The alleged mismanagement of this bank, from the opening to the closing of its doors, is necessarily drawn in question in this proceeding, and it is quite impracticable to distribute such mismanagement into parts and to deal separately with such parts. Nor does the misconduct imputed to Reilly as treasurer appertain to him alone. The charge is that, as treasurer, he was " specially intrusted with the custody of the funds, and was bound to pay them out only on depositors' drafts duly made, or for proper expenditures, and in case of moneys invested, only after the investment had been submitted to and approved by the finance committee.    *    *    *    Such payments and such loss, the complainant is informed and charges, took place in some of the instances herein mentioned, but which of them he is unable to specify until proofs are taken in the cause." Alluding to this matter, the chancellor says, and it seems to me very properly, that this charge against the treasurer is merely " on information, and is entirely too vague and indefinite to require an answer." As Patrick Reilly was not only treasurer, but was also one of the managers, and was, on that account, a necessary party to the proceeding, and if the charge was so " vague and indefinite " as not to require an answer, it is not perceived how the bill by the presence of such a charge could be made multifarious. The fact is, the matter was introduced as a circumstance in the mismanagement of the bank, and as such is not out of place.

The decision below should be reversed, and a decree made in favor of the receiver on all the demurrers.

*Decree unanimously reversed.*