THE STATE OF NEW JERSEY BY THEODORE D. PARSONS, ATTORNEY-GENERAL OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FIDELITY UNION TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT, AND CLINTON TRUST COMPANY, A BANKING CORPORATION OF THE STATE OF NEW JERSEY (IN DISSOLUTION), DEFENDANT-APPELLANT.

Argued October 28 and November 4, 1957—Decided December 9, 1957.

388

*Mr. Theodore McC. Marsh* argued the cause for the defendant-appellant Fidelity Union Trust Company (*Messrs. Riker, Emery & Danzig,* attorneys).

*Mr. Herman J. Harris* argued the cause for the defendant-appellant Clinton Trust Company (in dissolution).

*Mr. David D. Furman,* Deputy Attorney-General, argued the cause for the plaintiff-respondent (*Mr. Grover C. Richman, Jr.,* Attorney-General of New Jersey, attorney).

The opinion of the court was delivered by

BURLING, J. These are appeals by the defendants, Fidelity Union Trust Company and Clinton Trust Company, from the judgment of the Chancery Division of the Superior Court in favor of the State, providing for the escheat of certain personal property pursuant to the provisions of the 14 year escheat statute, *N. J. S.* 2A:37–11 *et seq.* We certified the matter on our own motion while it was pending in the Appellate Division.

In 1934, pursuant to a plan of reorganization, the Clinton Trust Company issued to persons entitled thereto full shares and fractional scrip certificates of a newly created class of stock known as Preferred Stock "B." Dividends were subsequently declared by the Clinton Trust Company on the outstanding full shares of this Preferred Class "B" stock from February 27, 1934 through April 1, 1947 at the rate of 75 cents per share per annum. No dividends were declared on the fractional shares but a fund was established by the Clinton Trust Company to provide for the payment of such dividends at the rate of 75 cents per full share *per annum,* when full shares were issued against fractional shares surrendered. These scrip certificates issued by Clinton in 1934 to persons only entitled to fractional portions of full shares expressly provided that all dividends on these fractional shares would be held by the company and paid only on full shares.

There are presently outstanding stock certificates for 218 full shares of Preferred Stock "B" of Clinton. No dividends have been claimed by the holders of .111 of such shares since April 1, 1942. These unclaimed dividends amount to $541.50.

There are also outstanding approximately 3,500 fractional certificates of Preferred Stock "B" which aggregate approximately 750 full shares. Prior to January 2, 1948 no claim could have been made by the holders of any of these fractional certificates for dividends unless and until they had acquired a sufficient number to constitute a full share or

shares. These rights changed on that date due to the bulk assets purchase of the Clinton Trust Company by Fidelity Union Trust Company.

Late in 1947 Fidelity Union and Clinton entered into an agreement whereby Fidelity Union acquired the assets and assumed the liabilities of Clinton and specifically undertook to pay to each holder of a share of Preferred Stock "B" the sum of $50 per share and to pay to the holders of fractional shares a proportionate part of $50 per share and in addition whatever dividends had accrued on the fractional shares from February 27, 1934 to January 2, 1948.

This action was commenced on August 15, 1950 against the Fidelity Union Trust Company alone seeking to escheat certain personal property held in the custody of Fidelity Union which had been unclaimed for 14 years pursuant to the 14-year escheat statute, *N. J. S.* 2*A*:37–11 to 37–28, *supra*. No particular reference was made to the Clinton shares or the dividends thereon. As a result of Fidelity Union's answer to that complaint and further proceedings in the matter, it became apparent that the personal property here in issue primarily involved the rights and obligations between the Clinton Trust Company and the holders of its Preferred Stock "B" and only secondarily involved the Fidelity Union by reason of its bulk assets purchase. In view of the issues, it was thought desirable that Clinton be made a party to the litigation. On March 19, 1956, prior to the trial of the issues raised, an application was made by the State for leave to file an amended complaint joining the Clinton Trust Company as a party defendant in the action. This application was granted and an amended complaint was filed by the State on April 11, 1956, naming the Clinton Trust Company as an additional defendant in this action. This amended complaint is substantially a duplicate of the original complaint filed against the Fidelity Union Trust Company except that the allegations are also directed to the Clinton Trust Company.

Fidelity Union filed an answer to this amended complaint as did Clinton and both continued to participate in the litigation as parties and still do.

Subsequently, Fidelity Union moved to vacate that order granting permission to file an amended complaint and either to dismiss the action against Clinton or to sever that action from the action against Fidelity Union. On this question the trial court held that the joinder was not invalid under *N. J. S.* 2A :37–24, which provides:

"It shall be lawful to join more than 1 escheatable property or estate and more than 1 defendant having possession thereof in 1 action where it appears that the amount of escheatable property in each case does not exceed $1,000."

The trial court also held that the full shares of Preferred Stock "B" of Clinton upon which dividends had been declared prior to April 2, 1942, but not claimed by the holders since that date, and those unclaimed dividends to April 2, 1942 that were carried on Clinton's books as an obligation on the date of the merger, were escheatable to the State. It further held that the choses in action of the shareholders of outstanding full and fractional shares of Preferred Stock "B" to obtain from Fidelity Union $50 per share or a *pro rata* portion of $50 per share plus the accrued dividends were also escheatable to the State. Here the court denied the contention of Fidelity Union that claims on these choses against it were contractual and barred by the statute of limitations on the ground that the funds representing these shares were a trust fund unaffected by any limitation. The court also held that the outstanding full shares on which dividends had been declared and paid subsequent to April 2, 1942 and the dividends not paid thereon were not subject to escheat because the 14-year period had not expired at the time of the institution of the action against Clinton.

The court's judgment, entered December 13, 1956, provided that upon the completion of the proceedings for escheat the Fidelity Union Trust Company should pay to the State:

| | | |
|---|---|---:|
| "(a) | For 111 full shares ........................... | $5,550.00 |
| (b) | Dividend accruing from 2/28/47 ................ | 69.93 |
| (c) | For unclaimed dividend checks .................. | 541.50 |
| (d) | For fractional shares aggregating approximately 750 shares ............................... ........ | 37,468.40 |
| (e) | For dividends accrued on fractional shares to January 1, 1948 ...................................... | 7,782.96 |
| | | $51,412.79 |
| (f) | Amount due to holders of 2503 fractional shares having a value of less than $1.00, payment of which has been waived by the State of New Jersey ..... | 986.88 |
| | | $50,425.91" |

There are three questions to be decided on this appeal: (1) whether the joinder of the two defendants in the same action of escheat was proper; (2) whether the State succeeded to any rights of certain of the Clinton shareholders; (3) whether these rights, if escheated to the State, may presently be asserted against Fidelity Union because of a trust obligation or are barred by the six-year statute of limitations.

## JOINDER.

The defendant Fidelity Union Trust Company contends that since the amended complaint eliminated all reference to it and substituted Clinton in its place and made no express claim for relief against Fidelity Union, no joinder in fact existed and the action should have been dismissed as to it. In this vein it also argues that joinder, if it did in fact exist, was nevertheless in violation of *N. J. S. 2A :37–24, supra,* which does not permit the joinder of actions of escheat except in cases where the escheatable property is less than $1,000 in each case.

These arguments are without substantive merit and furnish no basis for relief from the judgment here under review. The original complaint filed against the Fidelity Union Trust Company was general in character and sought not only the property in issue here but also all other property in its possession that was escheatable to the State under the provisions of the 14-year Escheat Act, *N. J. S. 2A :37–11*

*et seq., supra.* When the exact extent of this property became known all matters with respect to it were settled between the parties with the exception of those matters concerning the Clinton stock and its dividends. This then became the sole issue and it was apparent, in view of the agreement between Clinton and the Fidelity Union, that complete disposition of it could not be made without the presence in the action of the Clinton Trust Company as a party. The amended complaint was directed toward that end. Demand for relief was well within the contemplation of the complaint and well understood as such by both defendants. The amended complaint expressly sought an order providing for the distribution of the escheated property and the payment of it to the State Treasurer. The demand of the amended complaint is in fact for the escheat of the stock and its dividends, and Fidelity Union is concerned directly because it has by agreement undertaken to satisfy the obligations incident to this stock in issue. It filed an answer to the amended complaint and has given every indication of being aware of its position in the proceedings and the claim made against it. The case does not, therefore, involve claims to different property in the possession of different parties. Whatever claim is made against Fidelity Union is not as a separate party entirely but as one in the nature of a successor in whom the obligation of Clinton to its shareholders has been perpetuated or continued.

*N. J. S. 2A:37–24, supra,* was not designed to force the State to proceed separately, at its peril, in such circumstances as this, even though the amount involved exceeded $1,000. The obvious intent of the statute was to provide for the lawful prosecution under the act of many small but different claims in one action.

## MERITS.

We pass to a consideration of the general question of whether the State has succeeded to the rights of any of the unknown Preferred Stock "B" shareholders of Clinton.

On December 16, 1947, in accordance with the terms of the offer by Fidelity Union for the bulk sale of Clinton's assets, the requisite majority of stockholders of Clinton voted for dissolution. Clinton urges that upon dissolution its stockholders no longer had any property interests which the State might escheat. The gist of the argument is that, upon dissolution, the interests of the stockholders in the assets of Clinton were converted into a bare contractual right to recover the value of their shares from Fidelity Union.

In order to determine the rights of stockholders of Clinton at the time of dissolution, reference must be made to the applicable statutory provisions. Former *R. S.* 17:4–24 (repealed *L.* 1948, *c.* 67, *sec.* 336), governing banks and trust companies, made applicable to a dissolved bank or trust company the provisions of the General Corporation Act, *R. S.* 14:13–1 *et seq.*, to the extent that it was not inconsistent with that chapter.

By virtue of former *R. S.* 17:4–118 (repealed *L.* 1948, *c.* 67, *sec.* 336) and *R. S.* 14:13–5, the directors of a dissolved corporation are automatically made statutory trustees thereof for the purpose of winding up its affairs. It is now well established in this jurisdiction and elsewhere that at the moment of dissolution these trustees hold the assets of the corporation in trust for the benefit of creditors and stockholders. *In re Central New Jersey Land and Improvement Co.*, 113 *N. J. Eq.* 332 (*Ch.* 1933); *Fox v. Radel Leather Mfg. Co.*, 121 *N. J. Eq.* 291 (*E. & A.* 1937); *Matawan Bank v. Matawan Tile Co.*, 2 *N. J.* 116, 127 (1949); 16 *Fletcher on Corporations* (*perm. ed., rev. vol.* 1942), *sec.* 8134; Annotations 47 *A. L. R.* 1288, 1355 (1927); 97 *A. L. R.* 477, 479 (1935).

In *Fox v. Radel Leather Mfg. Co., supra,* 121 *N. J. Eq.* at *page* 295, the court in construing 2 *Comp. Stat. p.* 1635, § 54, which is substantially similar to *R. S.* 14:13–5, held:

"Upon the dissolution of the corporation it is provided by our Corporation Act (*Comp. Stat.* 1910, *vol.* 2, *p.* 1635, § 54), that the directors 'shall be trustees thereof, with full power to settle the

affairs, collect the outstanding debts, sell and convey the property and divide the moneys and other property among the stockholders, after paying its debts, as far as such moneys and property shall enable them. * * *' The following section 55 (page 1636) provides that such directors as trustees shall have power to sue for and recover debts and property, 'and shall be suable by the same name or in their own names or individual capacities, for the debts owing by such corporation, and shall be jointly and severally responsible for such debts, to the amount of the moneys and property of the corporation which shall come to their hands or possession as such trustees.' * * * The legislative intent as manifested by the statute was held to be, that at dissolution the assets of the corporation become a trust fund * * * for the benefit of the stockholders after the payment of all debts of the corporation, * * *; and that the effect of the provisions of the statute is to fasten the debts of the corporation upon its property at the moment of dissolution to exactly the same extent as though by express terms of the statute the legal title of the assets as distinguished from the equitable title, had at that moment been made to pass to the trustees for the purposes of a trust for equal distribution. *Trustees of Sea Isle City Realty Co. v. First National Bank of Ocean City,* 87 *N. J. Eq.* 84; *Camden Mortgage Guaranty and Title Company v. Haines,* 110 *N. J. Eq.* 461."

 Moreover, it is the general rule that at dissolution the equitable title to the distributive shares vests in the respective shareholders and, therefore, the monies representing unclaimed distributive shares are not available for distribution to the known shareholders. *In re Central New Jersey Land and Improvement Co., supra; In re Hull Copper Co.,* 46 *Ariz.* 270, 50 *P. 2d* 560 (*Ariz. Sup. Ct.* 1935), 101 *A. L. R.* 664, Annotation 670 (1936); *Brown v. Pennsylvania Canal Co.,* 279 *F.* 417 (3 *Cir.* 1922); *Drascovich v. Equitable Trust Co. of New York,* 3 *F. 2d* 724 (9 *Cir.* 1925). As stated *In re Central New Jersey Land, etc., Co., supra,* 113 *N. J. Eq.* at *page* 334:

"Upon dissolution of a corporation, the assets become a trust fund and the title of the stockholder becomes an equitable right to a distributive share therein * * *. The stockholders, in respect to that distribution, are not mere creditors; the money set apart for them belongs to them severally in equity and is not available for general distribution among the whole class of stockholders."

It is a necessary implication from the preceding authorities that such monies must be held in trust until such time as they are claimed by the owners or, as here, escheated by the State under an appropriate escheat act. See also, Note, *"The Lost Shareholder,"* 62 *Harv. L. Rev.* 295, 298 (1948); *Comment,* 45 *Yale L. J.* 720 (1936).

██ The proprietary interest of each stockholder is, at dissolution, transformed into an equitable right as *cestui que trust* to a *pro rata* distributive share of the assets of the corporation. We know of no legal alchemy whereby parties in the relationship of trust may be transformed into a relationship of contract. In the instant case the Preferred Stock "B" stockholders were entitled by the terms of the share certificates and the articles of incorporation to $50 per full share plus accrued dividends. The State may escheat the beneficial interest of all Preferred Stock "B" stockholders whose property has remained unclaimed for 14 years, *N. J. S.* 2A:37–13.

█ Having concluded that the State has escheated to valuable rights of the unknown Preferred Stock "B" shareholders of Clinton, we consider next the argument of Fidelity Union that in any event it is under no present obligation with respect to such rights. Its argument is predicated upon the notion that, by the terms of the contract between Fidelity Union and Clinton, Fidelity Union merely contracted to purchase the stock of the Preferred Stock "B" shareholders at the rate of $50 per share plus accrued dividends, and that by April 11, 1956 (the date of the joinder of Clinton) the six-year statute of limitations, *N. J. S.* 2A:14–1, barred recovery on its contractual obligation. The State, on the other hand, contends that the contract limitation is inapplicable for the reason that Fidelity Union's liability is grounded in trust. The State urges that Fidelity Union, by its undertaking, "may be said to have stepped into the shoes of Clinton with the result that a stockholder of Clinton would now be legally entitled to look to Fidelity as to any rights he may have." The contention has merit. As previously indicated, at the time of dissolution the assets of Clinton

were impressed with a trust for the benefit of shareholders and creditors. Receipt of the assets with knowledge of the fiduciary obligation would be sufficient to render Fidelity Union liable to the unknown Preferred Stock "B" shareholders of Clinton. 3 *Scott on Trusts* (2d ed. 956), § 288, *p. 2171, § 291, p. 2182; Restatement, Trusts,* § 289. But we find that the parties have arrived at the same result by the express terms of the contract. By its agreement with Clinton, Fidelity Union undertook "to purchase all of the assets of Clinton Trust Company at the closing date hereinafter specified; to assume all of the deposit and other obligations of Clinton Trust Company reflected on its books at the close of business on that date." It further provided:

"Fidelity Union Trust Company shall be deemed the agent of Clinton Trust Company and of its trustees in dissolution for the purpose of receiving and cancelling the certificates of stock and scrip of Clinton Trust Company to be presented and surrendered to it as hereinabove provided.

\* \* \* \* \* \* \*

Fidelity Union Trust Company shall settle all affairs of Clinton Trust Company and, at its own expense, complete its liquidation in all its aspects.

\* \* \* \* \* \* \*

Fidelity Union Trust Company agrees to save the trustees in dissolution of Clinton Trust Company harmless from all liabilities with respect to such liquidation."

It is apparent that the obligations of the Trustees of Clinton incident to liquidation were to be performed by Fidelity Union. The total effect of these express contractual obligations operated to create an assumption by Fidelity Union to discharge the primary obligations of the trustees of Clinton.

For the reasons stated, we conclude that any rights to which the State has succeeded in escheat from Clinton may be asserted against Fidelity Union.

■ We turn now from a consideration of general principles to the specifics. The record indicates that there were serious defects in the State's right to *presently* escheat some of the property of the unknown shareholders contained in the

judgment below, for the reason that the property has not yet remained unclaimed for 14 years and, hence, there can be no presumption of abandonment. In order to clarify the situation on the remand (hereinafter referred to) and to conclude the cause without resort to a later appeal upon the legal principles involved, we shall set forth and deal in detail with each item of personal property included in the judgment below.

(1) 111 full shares on which no dividends were claimed since April 2, 1942. No dividends having been claimed on such shares for 14 years prior to the joinder of Clinton, they were escheatable to the State and the State may recover their value at $50 per share from Fidelity Union.

(2) Dividends accruing from 2/28/47. Such dividends are not presently escheatable because 14 years have not run from the date of accrual. *State v. U. S. Steel Corp.,* 12 *N. J.* 38 (1953).

(3) For unclaimed dividend checks. Fidelity Union has expressly not appealed from this holding.

(4) Fractional shares aggregating approximately 750 shares. By the terms of these scrip certificates no dividends or voting rights could be acquired by the respective holders thereof until they had aggregated a sufficient number to redeem them for a full share. Since the holders of the scrip certificates could not make any claim prior to January 2, 1948 (the date that Fidelity Union first became obligated to pay), they cannot, without more, be presumed to have abandoned their rights because 14 years had not run at the time of the commencement of the action against Clinton. However, the record indicates that at least as to some of the fractional shares there may be circumstances sufficient to establish an abandonment as of April 11, 1956 (the date of joinder of Clinton). The scrip certificates as well as the full shares of Preferred Stock "B" were issued in 1934 to the depositors of Clinton. It may well be that some of the holders of the 111 full shares of stock upon which dividends had remained unclaimed since April 2, 1942 were also holders of scrip certificates. Having abandoned their rights

to the full shares, they may be presumed to have abandoned their rights on the fractional shares as well.

The record also indicates that some of the scrip certificates were in the possession of Clinton or Fidelity Union on the date the action was commenced against each of them. Where notice was sent in 1934 to those entitled to the scrip certificates and they failed to claim them, then such certificates are presently escheatable either because they have remained unclaimed for 14 years or because of the factual implication that their whereabouts have remained unknown for 14 years. *N. J. S.* 2A:37–13.

Since this court cannot determine from the present record how many of the scrip certificates fall within the categories referred to in the two preceding paragraphs, the cause must be remanded for further proceedings to establish the facts.

(5) Dividends accrued on fractional shares to and including January 1, 1948 (the last date prior to the obligation of Fidelity Union to pay). To the extent that the fractional shares in (4) above are escheatable to the State, the State may also recover the dividends on such shares. In *State v. U. S. Steel Corp., supra,* we held that the right to dividends is separate from the right on the share itself and that 14 years must elapse from the declaration of a dividend before the State may escheat the right. But the dividends on the instant fractional shares are readily distinguishable from ordinary dividends on full shares. The right to dividends on the fractional shares was inchoate until a full share had been acquired. Upon dissolution, however, it was necessary to evaluate the present rights of the holders of scrip certificates. The value of these fractional shares was calculated on the basis of $50 per full share plus the dividends which would have accrued had a full share been held in 1934, *i. e.,* $10.38. Thus, the dividends on the fractional shares were not something separate and apart from rights on the share itself but integrally related to its valuation.

The judgment is modified in accordance with this opinion and the cause is remanded for the following purposes:

(a) the entry of an immediate judgment relating to the items presently and finally disposed of;

(b) as to the remaining facets, to establish the appropriate and necessary facts to which is to be applied the law in accordance with this opinion. From the application of the law to the established facts, a resulting judgment is then to be entered.

No costs will be taxed to any party on this appeal.

HEHER, J. (concurring). The transfer of Clinton's outstanding full and fractional shares of Preferred Stock B at the rate of $50 per share, plus accrued dividends, under the Clinton-Fidelity contract of sale made December 16, 1947, and consummated three days later, was to all intents and purposes a cash transaction. The price thus fixed, the full value of the stock, was made payable in cash on January 2, 1948, on presentation and surrender to Fidelity of the certificates of stock or scrip "against which payment was demanded, endorsed for cancellation by the owner or holder thereof, with the signatures duly guaranteed." Clinton was thereupon effectually dissolved under *R. S.* 17:4–118, repealed by *L.* 1948, *c.* 67, *N. J. S. A.* 17:9*A,* but not operative, *section* 17:9*A*–339, to invalidate a contract of a bank or its stockholders "lawfully done or entered into" prior to that enactment. The discontinuance of Clinton's business was sanctioned by its directors, two-thirds in interest of the holders of stock and three-quarters in interest of all stockholders assenting; and thereupon, by force of *R. S.* 17:4–118, the corporation was "deemed to be dissolved," save for "distributing its assets and otherwise settling its affairs."

Had Fidelity then paid this portion of the purchase price directly to Clinton or its successor trustees in dissolution, the equitable title to the fund so created would have vested in the several holders of the particular stock, according to their distributive shares, wholly immune to the operation of the statute of limitations, *N. J. S.* 2*A*:14–1; and, by the same token, Fidelity's vicarious undertaking in this regard has the selfsame legal consequences, for Fidelity by the contract

assumed payment of the part of the purchase price so reserved as the agent of Clinton and its trustees in dissolution, for convenience of payment and its own protection in the retirement of the stock. This, by the express terms of the contract that Fidelity "shall be deemed the agent" of Clinton and of its trustees in dissolution "for the purpose of receiving and cancelling the certificates of stock and scrip" of Clinton "to be presented and surrendered to it as hereinabove provided." And Fidelity also undertook to "settle all affairs" of Clinton "and, at its own expense, complete its liquidation in all its aspects," and "to save the trustees in dissolution \* \* \* harmless from all liabilities with respect to such liquidation."

On dissolution, Clinton was under obligation to make "reasonable provision for the protection" of the holders of the stock in question; and the contract, so read, satisfies this standard. *United States Industrial Alcohol Co. v. Distilling Co. of America,* 89 *N. J. Eq.* 177 (*E. & A.* 1918); *New Jersey Title Guarantee & Trust Co. v. Berliner,* 136 *N. J. Eq.* 162 (*Ch.* 1945).

Fidelity's undertaking is in terms contractual, a promise to pay, not to hold the particular fund as a trust *res* for the benefit of the *cestuis que trust.* The true trust arises by a manifestation of an intention to create the requisite fiduciary relation, presently effective, and not a trust to arise at some future time. *Scott on Trusts* (*2d ed.*), *sections 2.1, 2.6, 23, 26, 462.1; Restatement, Trusts, section 26.* While we do not have here, the statute aside, an express trust founded upon a manifestation of an intention to create it, and subjecting Fidelity to equitable duties to deal with it for the benefit of others, there is yet a constructive trust raised in equity where a person holding title to property is under an equitable duty to convey it to another on the ground that he would be unjustly enriched were he permitted to retain it, a trust established by the law for reasons of justice. This equitable formula is applicable where the retention of the property or the beneficial interest therein would constitute an unconscionable advantage by the holder of the

legal title, even though its acquisition was not wrongful. Where the property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity holds him accountable as a trustee; and this, notwithstanding the statute of frauds. *Stretch v. Watson*, 5 *N. J.* 268 (1950); *Moses v. Moses*, 140 *N. J. Eq.* 575 (*E. & A.* 1947). See *Restatement, Trusts, sections* 1, 2, 4–14.

The beneficiaries of an express trust are not barred by laches or by the statute of limitations from enforcing the trust merely because of lapse of time, *Williams v. McKay*, 40 *N. J. Eq.* 189 (*E. & A.* 1885); *Scott, section* 10.5; it is only where the trustee has repudiated the trust to the knowledge of the beneficiaries that they may become barred from enforcing the trust. But a constructive trustee ordinarily holds the property adversely to the beneficiary, and "if the beneficiary knows of the circumstances giving rise to the constructive trust," he may be barred by "laches if he fails to sue within a reasonable time"; and laches depends upon the circumstances. Where the beneficiary of a constructive trust has "no reason to believe that the constructive trustee is holding the property adversely," the beneficiary will not be barred by laches "even though he knows of the circumstances giving rise to the constructive trust." *Scott, section* 481.1. And see 34 *Am. Jur., Limitation of Actions, section* 108, noting that the statute of limitations is generally applied to trusts created by implication or operation of law.

But where, as here, the trust fund still remains in the possession of the person accountable as trustee, equity forbids as unconscionable the use of the statute of limitations to retain the beneficial interest as his own, for the very reason that his conscience was charged with the trusteeship at the outset. Compare *Bovay v. H. M. Byllesby & Co.*, 27 *Del. Ch.* 381, 38 *A.* 2*d* 808, 174 *A. L. R.* 1201 (*Sup. Ct.* 1944), distinguishing, in regard to the statute of limitations, between a suit to compel corporate officers and directors to account for loss or damage resulting to the then bankrupt corporation through passive neglect of duty, without more, and a suit to

require them to answer for wrongful acts of commission by which they had enriched themselves to the injury of the corporation. And see *Baxter v. Moses,* 77 *Me.* 465, 1 *A.* 350 (*Sup. Ct.* 1885); *Kane v. Bloodgood,* 7 *Johns. Ch.* (*N. Y.*) 90 (1823), affirmed 8 *Cow.* 360 (1826); also Annotation, 174 *A. L. R.* 1222.

There is no suggestion of prejudicial delay here; the shares at issue are held by persons unknown or whose whereabouts are and have been unknown for the escheat period. It is inconceivable that demand for payment by the stockholder himself would now be refused; and the State derives its escheatable interest from the holders of these shares, by right of succession to property *bona vacantia* as part of the common ownership, that is to say, the "interest of the unknown or absentee owner." *State, by Parsons v. Standard Oil Co.,* 5 *N. J.* 281 (1950), affirmed 341 *U. S.* 428, 71 *S. Ct.* 822, 95 *L. Ed.* 1078 (1951).

For these reasons, I concur in the judgment, as modified.

JACOBS, J. (concurring). In *State v. U. S. Steel Corp.,* 12 *N. J.* 38 (1953), the court held that the escheat of abandoned stock did not include dividends thereon which had been declared within the 14-year period. The dissenting opinion by Justice Brennan, in which Chief Justice Vanderbilt and I joined, pointed out that this result was highly undesirable and was inconsistent with the dominant legislative purpose. The State has not sought reconsideration of the adverse determination in *State v. U. S. Steel Corp.,* and it remains the law. Accordingly, while adhering fully to my original view, I record my concurrence in the instant matter.

HEHER and JACOBS, JJ., concurring in result.

*For modification*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING, JACOBS, FRANCIS and PROCTOR—6.

*Opposed*—None.