In re CENTRAL STATES POWER & LIGHT CORPORATION et al.

Civ. A. No. 354.

District Court, D. Delaware.

Oct. 28, 1947.

Arthur Goldman and Myron S. Isaacs, both of Philadelphia, Pa., for Securities and Exchange Commission.

Douglas A. Calkins, of New York City, (of Simpson, Thatcher & Bartlett), of New York City, for Ogden Corporation.

C. W. Retnauer, Treasurer, for Central States Power & Light Corp. and Central States Utilities Corp.

Morris L. Forer (of Wolf, Block, Schorr & Solis-Cohen), of Philadelphia, Pa., for Committee of Preferred Stockholders of Central States Power & Light Corp.

Morris A. Marks (of Geist & Netter), of New York City, for Arthur and Sidney

Burnstine, holders of Bonds of Central States Utilities Corp.

Aaron Finger and Robert H. Richards, Jr. (of Richards, Layton & Finger), both of Wilmington, Del., and Orville W. Wood (of Milbank, Tweed, Hope & Hadley), of New York City, for Chase Nat. Bank of City of New York and Carl E. Buckley, Trustees.

Edmund A. Stephan (of Mayer, Meyer, Austrian & Platt), of Chicago, Ill., for Continental Illinois Nat. Bank & Trust Co. of Chicago, Trustee for Central States Power & Light Corp. 5% Debentures.

LEAHY, District Judge.

A Supplemental Application has been filed by the Securities and Exchange Commission. These proceedings were first instituted here in December 1943 when a plan was filed and approved for Central States Power & Light Corporation in its effort to comply with the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq. See also D.C., 58 F.Supp. 877. The plan included certain proposals for the liquidation of Central States, Central States Utilities Corporation, both holding companies and subsidiaries of Ogden Corporation. Central States has liquidated its assets. From time to time the company received court approval to extend the maturity date of its debentures; many complicated issues of fact and law have been present respecting the public holders of Central States debentures and preferred stock and Central Utilities' and Ogden's bondholders. The present application is a modified plan whereby all these issues have been settled and both Central States and Central Utilities will be dissolved. The plan, as finally modified, is the result of a compromise arrived at by arm's-length dealing between Ogden on one hand and the public security holders on the other.

The Commission has summarized the plan as follows:

(1) The interest heretofore received by Ogden on its holdings of Central States debentures, aggregating $383,103, and escrowed with the Manufacturers Trust Company, will be paid to and become part of the general assets of Central States.

(2) Central States will pay, or make provision for the payment of, all of its known current and accrued liabilities, and will reserve and set aside funds sufficient to pay the expenses and fees of liquidation.

(3) After the payment, or making provision for the payment, of its liabilities and expenses as provided in paragraph (2) above, Central States shall cause to be paid (a) to the holders, other than Ogden, of the 5% Debentures $81 for each $100 principal amount of such debentures ($673,888) together with accrued and unpaid interest on the principal amount to the effective date of the Amended Plan (9.58% of $79,-700 as of June 1, 1947), and (b) to the holders, other than Ogden, of the $7 Dividend Preferred Stock of Central States $9 per share ($598,743).

(4) After providing for the payments described in paragraphs (2) and (3) above, Central States will pay and turn over to Ogden, as payment on the principal of the 5% Debentures of Central States owned by Ogden, all the remaining assets of Central States free of any claim, lien or defense with respect thereto.

(5) Ogden will cause to be paid through the trustee for the 6% Gold Bonds of Central Utilities to the holders of such bonds, other than Ogden ($370,900 principal amount so held), an amount in cash equal to $7.50 for each $100 principal amount of such bonds ($22,817).

(6) The holders of the $7 Dividend Preferred Stock and of the common stock of Central Utilities, and the holder of the common stock of Central States, shall not be entitled to participate in the liquidation of such companies.

(7) If and when the modified plan will become effective, and provision shall have been made for the payments described in paragraphs 3 (a) and 5 above in respect of Central States' debentures and Central Utilities' bonds, the respective trustees for such debentures and bonds will execute and deliver to the respective companies proper instruments evidencing the discharge of the respective indentures securing such securities, and the said companies will thereafter be freed from all liabilities in respect of such securities.

(8) If any holders, other than Ogden, of the 5½% First Mortgage Bonds, 5% Debentures and $7 Dividend Preferred Stock of Central States, and of the 6% Bonds of Central Utilities, shall not have presented their securities for payment prior to December 17, 1950, all rights of such persons to any such funds shall cease and the trustees and Distributing Agent, upon demand of Ogden, shall transfer to Ogden all such funds in their possession and Ogden shall be entitled to retain such funds free of any claim or lien with respect thereto, provided, however, that within a period not more than sixty days and not less than thirty days prior to December 17, 1950, Ogden shall at its expense cause said trustees and Distributing Agent, to publish once a week for three successive calendar weeks in a newspaper of general circulation in New York, Boston and Chicago a notice of the time when the rights of such persons to such funds expire.

(9) Central Utilities and Central States are to be dissolved. In this connection, the Chase National Bank of the City of New York, as trustee for Central Utilities' bonds, shall vote the shares of common stock of Central States pledged under the Trust Indenture in favor of the dissolution of Central States.

(10) Ogden shall be liable for and shall pay all expenses of the dissolution of Central Utilities, and upon such dissolution there shall be transferred to Ogden as payment of the principal of the bonds of Central Utilities owned by Ogden all the remaining assets, if any, of Central Utilities.

(11) It is further proposed by Ogden that upon the entry by the Commission of an order approving the Amended Plan, the Boards of Directors of Central States and Central Utilities shall request the Commission, pursuant to Section 11(e) of the Act, to apply to a court of competent jurisdiction to enforce and carry out the terms and provisions of the Amended Plan. When said Amended Plan is approved by such court the Boards of Directors of Central States and Central Utilities may declare the Amended Plan effective promptly thereafter, or may, in their discretion, delay declaring the Amended Plan effective until all appeals from the court order shall have been disposed of or until after the time for appeal from the court order (90 days after entry) shall have elapsed.

There are objections to the allocations which are made to the various classes of security holders. The subject matter of these objections was explored by the Commission and carefully weighed. The treatment to be afforded all classes is discussed at length in the Findings and Opinion of the SEC, Holding Company Act Release No. 7568. As to this phase of the matter I adopt the Findings and Opinion of the Commission.

Other objections to the modified plan come from two banks. The Continental Illinois National Bank and Trust Company of Chicago, as Trustee under Central States' debentures, argue against that provision of the plan which creates a cut-off date of five years as to those debenture holders who fail to claim their distributive shares as being against the terms of the indenture and therefore this portion of the plan violates § 26(c) of the Act and the Fifth Amendment to the Constitution. The Chase Bank asserts the funds which were deposited for the payment of Central States' bonds were "irrevocably deposited" for that purpose, and as Trustee it contends the provision in the plan dealing with unclaimed money so deposited is unlawful. This claim is based on the fact that on November 10, 1944 a supplemental order (followed by other orders of this court) was entered in these proceedings directing Central States to deposit irrevocably with the Chase Bank funds (to be made available from the sale of certain of its properties) to pay Central States' bonds.

■ 1. Although the question has never before been litigated, I believe an enforcement court under the Public Utility Holding Company Act of 1935 has the power under § 11(e) of the Act to approve a plan which makes provision for the disposition of funds which remain unclaimed by security holders entitled to them after adequate measures for notice to receive payment are made over a reasonable period of time by both administrative agency and court controls. The basis for this view is found in

my earlier decision in Re American Gas and Power Co., D.C.Del., 55 F.Supp. 756, where it was stated that while § 26(c) of the Act deals with rights of contract creditors it does not limit either the power of the Commission or the enforcement court to modify such rights with respect to the distribution which all classes of security holders are to receive as an incidence as to what is a fair and equitable plan under a § 11 proceeding. Cf. In re Consolidated Electric & Gas Co., D.C.Del., 55 F.Supp. 211, 216; In re Central States Power & Light Corp., D.C.Del., 58 F.Supp. 877, 879. In Re Cities Service Co., D.C.Del., 71 F. Supp. 1003, I approved a plan—true, there was no objection raised—as fair and equitable which provided for a reasonable cutoff provision. There is authority that under its general equity power a court in a reorganization situation may provide for the disposition of unclaimed funds. Hendrie v. Lowmaster, 6 Cir., 152 F.2d 83.

■■ 2. The proceedings in the case at bar have consisted of one over-all plan and in enforcing compliance we have had many facets of this plan which, in an attempt to comply with novel legislation, we have called "supplemental application" or "a plan as modified", etc. The crux of the matter is the companies have been under the jurisdiction of this court since 1943. In entering four separate orders at different times directing that money be deposited with the Chase Bank, for example, for payment to security holders I did not dispose of the whole plan—if for no other reason than that the subject companies had not completely, in point of time, complied with the Act. When these orders were entered certain proposals had been consummated and others were to be consummated in the future. Now, we are coming into the home stretch for the present application involves the final dissolution of Central States and Central Utilities and resolves all of the issues left open in the prior stages of this proceeding which must, of necessity, include a provision for unclaimed funds. If the view urged by the two banks is to be adopted, then the court dissipated its power to provide for unclaimed funds by using the words "irrevocable" and "irrevocably" in describing deposits to be made for payment of security holders. As the Commission points out an "irrevocable deposit" for a particular purpose cannot be cancelled but, this does not mean that the deposit is to last forever; especially in the light of the dominant purpose to be served. The indentures provide for the donation of deposits for payment upon redemption or at maturity but they say nothing about such securities being paid under a § 11(e) plan. In fact, it was always intended any unclaimed funds were a part of Central States' residual assets and since the first deposit under this court's order all the balance sheets so indicate. Neither management nor the Commission nor this court regarded the deposits as creating a perpetual trust. The claim of Chase is clearly opposed to the practical construction of the orders by all parties for three years. No one intended the Chase Bank should have use of the unclaimed money forever.

After looking into the factors which support the view that Ogden may, perhaps, be the recipient of the residual assets in the form of unclaimed funds, I think the plan provides a fair and equitable distribution of the unclaimed funds. A cut-off period of six years and five years for the bonds and debentures; provision for repeated annual notice by mail and publication; with a reservation that the Commission might require further attempts to stimulate dilatory security holders to claim that which is theirs, with the condition the SEC may apply to the enforcement court for approval of specific techniques to carry out the desired purpose—all show an appropriate method of dealing with unclaimed funds.

As an integral phase of the fundamental compromise, the condition that all unclaimed funds are to revert to Ogden is likewise fair. This was a vibrant part of that compromise. Ogden gave up a prima facie claim to $1,000,000 and assumed the expenses of dissolution and giving of the notices just referred to. At bottom, this is a practical solution; and it has, I have concluded, a valid legal basis.

An order of approval may be submitted.