In the Matter of **STANDARD GAS AND ELECTRIC COMPANY.**

Civ. A. No. 1497.

United States District Court
D. Delaware.

July 29, 1969.

Aaron Levy, Philip A. Loomis, David Ferber and Frank N. Fleischer, Washington, D. C., for Securities and Exchange Commission.

Hellerstein, Rosier & Rembar, George Rosier and Victor Brudney, New York City, of counsel, for Standard Gas and Electric Co.

Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen., and Joel Lewittes, Asst. Atty. Gen., New York City, for State of New York.

OPINION

LATCHUM, District Judge.

The Securities and Exchange Commission ("Commission") applied to this Court, pursuant to §§ 11(e) and 18(f) of the Public Utility Holding Company Act ("Act"),[1] for an order approving and enforcing the provisions of Step VI (the final Step) of a Plan of Liquida-

1. 15 U.S.C. § 79k(e), 79r(f).

tion and Dissolution ("Plan"), filed by Standard Gas and Electric Company ("Standard") in compliance with § 11 of the Act. The Comptroller of the State of New York ("New York") appeared, objected to the application, and asserted a claim, under Article V of the New York Abandoned Property Law, Mc-Kinney's Consol.Laws, c. 1,[2] to all distributions made under prior Steps and Step VI of the Plan to stockholders of record residing in New York but which were or may be unclaimed because such stockholders could or can not be located. Some background is needed to understand New York's objections and claim, the matter now in litigation.

In 1948, Standard, a Delaware corporation and a public utility holding company registered under the Act, was ordered by the Commission to liquidate and dissolve pursuant to § 11(b) (2) of the Act, 15 U.S.C. § 79k(b) (2).[3] An overall plan of compliance by Standard was filed with the Commission in 1951, and thereafter over a period of some 18 years, Standard filed various specific amendments and supplements ("Steps") thereto to cover divestment of subsidiaries, settlements with various claimants and, as its assets were marshalled and portfolio securities and funds became available, distributions to security holders. All of these Steps were approved

by the Commission.[4] Pursuant to Steps I through II–A of the Plan, Standard retired its outstanding senior securities. Partial distributions[5] were made to Standard's common stockholders under Steps III through V. Steps III through V provided for five year periods during which time Standard was to attempt to locate all its common shareholders who were entitled to those distributions. Step V also provided for the formal dissolution of Standard under State law[6] and for the subsequent distribution of its remaining assets. In addition, Step V called for the termination of all rights of Standard's stockholders to all unclaimed distributions which were approved for distribution under Steps III through V. Step V was approved by the Commission on January 19, 1961 and ordered enforced by this Court on April 22, 1961.

On August 31, 1966, Standard petitioned this Court for a Bar Order, terminating the rights of its unlocated common stockholders, who had failed to surrender their stock certificates for cancellation and otherwise perfect their rights, to receive cash and security distributions under Steps III through V. After hearing, this Court, on September 29, 1966, entered an order finding that Standard's efforts since 1953 "to locate all stockholders of Standard Gas entitled

---

2. Chapter 815 of Laws of 1963, effective April 26, 1963.

3. Standard Gas and Electric Company, 28 S.E.C. 944 (1948); 32 S.E.C. 545 (1951).

4. Standard Gas and Electric Company, 34 S.E.C. 80 (1952); 34 S.E.C. 749 (1953); Holding Company Act Release No. 12101 (1953); 36 S.E.C. 97 (1954); 37 S.E.C. 532 (1957); and Holding Company Act Release No. 14352 (1961).

5. Step III, approved by the Commission on Aug. 13, 1953 to become effective on Aug. 25, 1953, provided for a distribution of ¼ of a share of Duquesne Light Company ("Duquesne") common stock for each share of Standard common. Step III–A, approved by the Commission on Dec. 10, 1954, ordered enforced by this Court on February 11, 1955, effective on February 25, 1955, provided

for the distribution of 1/10 of a share of Duquesne common for each Standard common. Step IV, approved by the Commission on Feb. 4, 1957, ordered enforced by this Court on March 14, 1957, effective on May 15, 1957, provided for the distribution of ¼ of a share of Duquesne common for each share of Standard common. Step V, approved by the Commission on Jan. 19, 1961, ordered enforced by this Court on April 22, 1961, effective on July 18, 1961, provided for the distribution of cash and a package of securities, viz. 2/25 of a share of Duquesne common, 1/100 of a share of Duquesne 4% Preferred, 3/100 of a share of Wisconsin Public Service Corp. common and cash of $1.30 for each share of Standard common.

6. Standard filed and recorded its certificate of dissolution on August 3, 1961.

to distribution pursuant to the provisions of Steps III, III–A, IV and V * * * have been reasonable" and the Court further ordered that the rights of Standard's common stockholders to receive distributions under Steps III through V be terminated as of October 3, 1966. The order did not purport to cut off stockholders' rights to future distributions.

On December 11, 1968, as previously mentioned, the Commission applied to this Court for an order approving Step VI of the Plan. Step VI provides: (1) for the final distribution of Standard's remaining assets consisting of about $3,000,000 in cash, (2) that shareholders who do not surrender their stock certificates on or prior to the cut-off date, viz. six months following the effective distribution date, will forego their right to the final distribution and (3) that Standard will again make every reasonable effort to locate its common stockholders who fail to surrender their certificates within one month of the effective distribution date. Prior to this application, the Commission had found Step VI to be necessary to effectuate the provisions of § 11(b) of the Act, that the plan was "fair and equitable" to all persons affected thereby and that the Step satisfied all the requirements of the applicable provisions of the Act.[7]

Thus, it will be noted that under Step V of the Plan all unclaimed distributions under Steps III through V up to the cut-off date of October 3, 1966, set in the Court's Bar Order of September 29, 1966, were cut off from the stockholders who failed to claim them and are to be distributed to the known identified stockholders of Standard who did perfect their rights. Under Step VI similar treatment is accorded to the final distributions to be made under that Step. It is these tontine-type provisions which New York challenges in these proceedings.

At the hearing in this Court on September 29, 1966 when Standard, with Commission approval, sought the Bar Order terminating the rights of its unlocated common stockholders to receive cash and security distributions under Steps III through V, a representative of the Attorney General for the State of New York appeared on behalf of the State Comptroller in opposition to the entry of the Bar Order and orally asserted a claim to all possible distributions which might be due the Comptroller in his custodial capacity under New York's Abandoned Property Law. However, it was agreed in open court, and later by written stipulation, that the Bar Order, which was entered by the Court on September 29, 1966, would not prejudice New York's claim under its Abandoned Property Law to the cash and securities held by Standard for its unlocated stockholders who were recorded on Standard's books as New York residents. This stipulation was entered into because it was noted (1) that Standard had sufficient assets to enable New York to be paid at the time of Standard's final distribution if New York's claim was found to be valid and (2) that New York would have ample opportunity formally to file its claim at the time Standard sought Commission and Court approval to make its final distribution.

After the Commission applied on December 11, 1968 for Court approval and enforcement of Step VI, the final distribution, New York filed its formal claim, contending that the unclaimed amounts, relating to stockholders whose last known addresses are in New York, are deemed to be abandoned property payable to New York under its Abandoned Property Law, rather than distributable to the other Standard stockholders in accordance with the Plan.

At the hearing on January 17, 1969, the Court entered its order approving and enforcing Step VI but the parties agreed in open court that the maximum

7. Standard Gas and Electric Company, Holding Company Act Release No. 16228 (Dec. 3, 1968).

amount of New York's claim did not exceed $85,000 and that this amount would be reserved from distribution until final adjudication of New York's claim.

Of the securities and cash unclaimed by stockholders and held by Standard in the fall of 1966, New York laid claim to the following: 1572 shares of Duquesne common stock, 5 shares of Duquesne preferred stock, 38 shares of Wisconsin common stock, $5,170.00 comprising cash in lieu of fractional shares and $21,846.64 comprising accumulated cash dividends as of December 31, 1966. As required by the Plan and the orders of the Commission and this Court, all of the aforementioned securities were sold on or about February 16, 1967, and the proceeds ultimately realized from the sale were $48,763.74 for the Duquesne common, $188.70 for the Duquesne preferred and $717.06 for the Wisconsin common. Thus, New York's claim consists of three parts. First, it claims the sum of $76,695.14 (representing the stock sale proceeds and the cash before mentioned), the amounts which were distributable under Steps III through V of the Plan but unclaimed by unlocated common stockholders who were New York residents. Second, it claims $720.96 representing the total proceeds due to two New York resident-owners of three shares of Standard's preferred stock which were distributable in 1953 under Step II and subject to a Bar Order of this Court entered on June 15, 1959. Third, New York claims cash in the approximate amount of $2500 to be distributed under Step VI to persons recorded on Standard's books as New York residents but which may not be claimed by such stockholders.[8]

The Public Utility Holding Company Act, enacted by Congress under its power to regulate interstate commerce, places the responsibility upon the Commission to require registered public utility holding companies to take the necessary steps under an over-all plan which the Commission finds necessary to simplify their corporate structures. The provisions of all such Plans are required by the Act to be "fair and equitable" to the persons affected thereby.

New York takes the position that the "fair and equitable" requirement of § 11(e) does not authorize the termination of stockholders' rights to unclaimed funds. Thus, it argues that Standard's Plan is "unfair and inequitable" because "it provides for a cut-off of stockholders —a class that may not be barred." Further, New York contends that the provision in Standard's Plan for a distribution of unclaimed funds among known and located stockholders "violates vested rights of unlocated stockholders" and hence is contrary to the "fair and equitable" standard of § 11(e). New York concludes from these premises that Standard's Plan "allows unjust enrichment and a 'windfall' for a group unentitled to the fund," and that New York is the sole and logical successor to the unclaimed funds distributable to New York stockholders. This argument involves a federal question since it turns on the intent and reach of the "fair and equitable" requirement of the Act.

I cannot agree with the restrictive interpretation of § 11(e) urged by New York. In my view, the statutory standard of "fair and equitable" does not require New York to be treated, by reason of its Abandoned Property Law, as the successor to the interests of unlocated Standard stockholders whose last known addresses were in New York.

The only reported case found, discussing the power of the court to approve a § 11(e) plan containing provisions for the distribution of unclaimed funds, is this Court's decision in In re Central States Power & Light Corporation, 74 F.Supp. 360 (D.Del.1947). In

8. It is now impossible to determine the exact amount that may be unclaimed by New York residents under the Step VI distributions, but if no other persons fail to make claims than those heretofore involved, it is estimated that there will be approximately $2500 unclaimed by stockholders whose last known addresses were in New York.

that case, which I view as controlling here, Judge Leahy specifically upheld the statutory authority under § 11(e) to bar rights of security holders who could not be located, saying (p. 362):

> "Although the question has never before been litigated, I believe an enforcement court under the Public Utility Holding Company Act of 1935 has the power under § 11(e) of the Act to approve a plan which makes provision for the disposition of funds which remain unclaimed by security holders entitled to them after adequate measures for notice to receive payment are made over a reasonable period of time by both administrative agency and court controls."

Moreover, such bar orders have regularly been standard provisions of numerous § 11(e) plans, repeatedly noted and approved by the Commission[9] and in several cases found by the Commission to be "appropriate," "fair and equitable."[10] Indeed, in one case in which the plan as filed made no disposition of unclaimed securities the Commission required the inclusion of an appropriate amendment to that effect.[11] The Courts, in reviewing and enforcing the Commission's orders, have implicitly agreed with the Commission's approval of such bar orders. This frequent and prolonged practice of giving approval to such bar orders leaves little doubt that the Act has been correctly interpreted to authorize the termination of stockholder rights,[12] particularly since the application of the "fair and equitable" standard "belongs to the usual administrative routine" of the Commission.[13]

New York points to the lack of express statutory authority for such cut-off provisions in § 11(e) and maintains they are invalid provisions of any Plan. But New York overlooks the fact that the concept of a "fair and equitable" Plan embraces such a provision, as Judge Leahy held in *Central States*. New York also ignores the fact that a district court under its general equity powers was authorized to establish a cut-off date in reorganization proceedings under former § 77B of the Bankruptcy Act, which "contained no express provision governing the disposition of surplus assets of the character here involved."[14] Analogizing, there is no question that stockholders' rights may be terminated under the "fair and equi-

---

9. See, for example, Arkansas Fuel Oil Corp., 40 S.E.C. 26, 42 (1960); United Gas Improvement Co., 33 S.E.C. 729, 735 (1952); Green Mountain Power Corp., 32 S.E.C. 329, 336 (1951); Sioux City Gas & Electric Co., 30 S.E.C. 5, 13 (1949); Commonwealth v. Southern Corp., 28 S.E.C. 776, 782 (1948).

10. Arkansas Fuel Oil Corp., 40 S.E.C. 26, 115 (1960); American States Utilities Corp., 22 S.E.C. 491, 501–502 (1946).

11. Long Island Lighting Co., 30 S.E.C. 441, 539–540 (1949). The Commission proposed an amendment to provide that any old securities unexchanged for new common stock within a specified number of years be returned by the exchange agent for cancellation by the consolidated company into which under the plan the subsidiary companies were being merged. In its Findings and Opinion (p. 540, note 147) in that case the Commission compared Section 204 of Chapter X (11 U.S.C. § 604), under which security holders must present their securities within five years in order to receive the distributions provided by the plan, after which time their participation under the plan is barred.

12. Mazer v. Stein, 347 U.S. 201, 211–213, 74 S.Ct. 460, 98 L.Ed. 630 (1954); Great Northern Ry. Co. v. United States, 315 U.S. 262, 275, 62 S.Ct. 529, 86 L.Ed. 836 (1942); United States v. American Trucking Associations, Inc., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940).

13. Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 86 L.Ed. 301 (1941); NLRB v. Hearst Publications, Inc., 322 U.S. 111, 130, 64 S.Ct. 851, 88 L.Ed. 1170 (1944); see also SEC v. Chenery Corp., 332 U.S. 194, 208–209, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

14. Hendrie v. Lowmaster, 152 F.2d 83, 85 (C.A.6, 1945); Knapp v. Detroit Leland Hotel Co., 153 F.2d 715, 717 (C.A.6, 1946); Duebler et al. v. Sherneth Corp., 160 F.2d 472, 473 (C.A.2, 1947).

table" requirement of § 11(e) as they could be under the equitable doctrine applied in § 77B bankruptcy proceedings.

New York also attempts to distinguish the *Central States* holding on the ground it involved the cut-off of creditors' claims and not of "shareholders' rights." But in that case, while the controversy arose only with respect to creditors, the bar provisions upheld by this Court extended as well to preferred stockholders.[15] More importantly, however, the power of the court under § 11(e) permits the modification and alteration of vested rights of *all* security holders on a "fair and equitable" basis[16] and grants no special immunity to such rights of common stockholders in a liquidation under § 11(e).

It has been the uniform practice of the Commission to include provisions in § 11(e) Plans requiring the companies involved to attempt diligently to locate all missing stockholders. In this case, the record is clear that prior to each Step of Standard's Plan being approved, each Standard stockholder was personally mailed a notice and notice of the cut-off provisions was published in the federal register and given to all persons on the Commission's mailing list. Before this Court approved these cut-off provisions, notice of hearing was published in newspapers of general circulation in various cities throughout the United States and mailed to each stockholder. In addition, Standard made extensive inquiries of missing stockholders with the postal authorities, also of occupants of premises formerly occupied by those stockholders, examined telephone directories and retained a firm, Tracer Company of America, which is in the business of tracing lost stockholders, to pursue those whom the company was unable to contact. These procedures extended over a thirteen year period.

I must conclude that the extensive and meticulous effort made to locate missing stockholders was reasonable and satisfies the "fair and equitable" provision of § 11(e). As Judge Leahy said in the *Central States* case, supra, 74 F. Supp., p. 363:

"A cut-off period of six years and five years for the bonds and debentures; provision for repeated annual notice by mail and publication; with a reservation that the Commission might require further attempts to stimulate dilatory security holders to claim that which is theirs, with the condition the SEC may apply to the enforcement court for approval of specific techniques to carry out the desired purpose—all show an appropriate method of dealing with unclaimed funds."

Redistribution of the unclaimed funds to other security holders entitled to the residual equity interest in the company is also clearly fair and equitable. In a liquidation, as in the case of Standard, such equity belongs to the common stockholders, and by the terms of the Plan in the present proceeding all unclaimed funds will be included in the final distribution to the Standard stockholders who have been located and who shall present their stock certificates for cancellation.

The distribution to the other Standard stockholders of unclaimed funds is not a gratuity, as asserted by the State of New York. On the contrary, there are substantial equities which favor the known and located stockholders of Standard who are to receive the unclaimed funds under the Plan. Over the years Standard has been required to incur expenses to locate missing security holders in compliance with the orders of the Commission and this Court, and spe-

15. See Central States Utilities Corp., 26 S.E.C. 369, 406–407 (1947).

16. SEC v. Central-Illinois Securities Corp., 338 U.S. 96, 69 S.Ct. 1377, 93 L.Ed. 1836 (1949); Otis & Co. v. SEC, 323 U.S. 624, 65 S.Ct. 483, 89 L.Ed. 511 (1945); American Power & Light Co. v. SEC, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103 (1946); In re Standard Gas & Electric Co., 151 F.2d 326 (C.A.3, 1945), cert. den. Guaranty Trust Co. of N. Y. v. SEC, 327 U.S. 796, 66 S.Ct. 820, 90 L.Ed. 1022 (1946).

cial proceedings in this Court were necessary to bar the participation provided in the Plan for unlocated stockholders. All such costs, including legal fees, are and have been charged against the common fund available for distribution to the Standard stockholders as a class. Since the missing security holders hold only a small minority of the Standard stock, a substantial part of the costs for the search and the related judicial proceedings is paid for by the other stockholders of Standard. If fairness requires that the search for missing stockholders be made, it is not unfair that its cost to the other stockholders be compensated.

I do not suggest that the cost to search for missing stockholders is equal to the amount of the unclaimed funds in Standard's possession, or that § 11(e) requires such monetary equivalence. The disposition of funds, the right to which has been extinguished, calls for a practical, not a mathematical, solution. When a § 11(e) plan is approved, it is impossible to estimate either the cost of the effort to find the security holders or the amount that may remain unclaimed. An undertaking in advance to spend on the search what may be reasonably necessary and to distribute to the participating security holders whatever remains is a sensible and practical solution.

Far more substantial sums than the cost of locating security holders have been spent by Standard in its overall program of liquidation and dissolution, all of which, including the costs of the related administrative and judicial proceedings on the various steps in the liquidation, have necessarily been absorbed by its common stockholders. The liquidation of Standard was not dictated or authorized by its stockholders but was required and ordered by the Commission pursuant to the corporate simplification requirements of § 11(b)

(2) of the Act. To the extent that some unclaimed funds have become available in the course of Standard's dissolution, the distribution thereof to the participating stockholders does not constitute "unjust enrichment" but is realistically a reduction in the cost of dissolution to them. This is a fair and equitable application of the unclaimed funds.[17]

 The typical situations in which State escheat statutes have been applied are fundamentally different. A bank holds funds in a long-dormant account; an insurance company retains the proceeds of an unclaimed insurance policy; or a company has outstanding corporate dividend checks which have not been cashed. There is no reason for these institutions thereby to acquire ownership of the funds involved. As the Supreme Court said in Texas v. New Jersey, 379 U.S. 674, 680, 85 S.Ct. 626, 630, 13 L. Ed.2d 596 (1965), "it would be strange to convert a liability into an asset when the State decides to escheat." In such cases there is no obligation to search for the missing claimants, and certainly not of a kind or extent required in the administration of § 11(e) of the Act. Under § 11(e), as indicated, there are good and equitable grounds for the distribution of the unclaimed funds to the participating stockholders. I am satisfied that the distribution of the unclaimed assets proposed by the various Steps under Standard's Plan is "fair and equitable" under § 11(e) and should pass to the known security holders.

Since I have found that the cut-off and tontine-type provisions of Standard's Plan were "necessary" and "appropriate" to give practical effect to a "fair and equitable" plan under the Act, those provisions operate to deny New York's claim. This is so because the Plan constitutes the implementation of a Federal statute and embodies specific federal policy of barring stockholder claims aft-

---

17. In the *Central States* case this Court approved the distribution of unclaimed funds to the parent company of Central States as part of a settlement of the parent company's claim against Central States and its assumption of the expenses of dissolution. This Court said: "At bottom this is a practical solution; and it has, I have concluded, a valid legal basis." (74 F.Supp. at 363).

er reasonable notice and making a tontine-type distribution of remaining funds an appropriate mode for effectuating the provisions of the Act. To the extent the policy conflicts with New York's Abandoned Property Law, the federal command must prevail and New York is powerless to interfere under the Supremacy Clause of the Constitution of the United States.

■ Of course, there is no longer any basis to question whether the Act is an appropriate exercise of Federal power under the Commerce Clause. The command of § 11 of the Act, and the alteration of security holders' rights by Plans approved thereunder, uniformly have been upheld by the Supreme Court.[18] In fact, far more radical interferences with local law than is here involved have been held to prevail, when required by Plans adopted and approved under the Act. Thus, in In re Kings County Lighting Co.,[19] the power of the Commission was upheld under the "fair and equitable" standard of § 11 to approve a plan which altered security holders' rights on the basis of a method of evaluation which the New York Public Service Commission found entirely improper under New York law, and to which it objected. So also in Phillips v. SEC,[20] the voting requirements of the General Corporation Law of Delaware were held to be overridden by a Plan adopted under the Act and approved by the Commission. These decisions clearly demonstrate that the Act places Federal power over interstate commerce behind Plans adopted thereunder and approved by the Commission as "fair and equitable" and that such power is adequate to enable the provisions of such a Plan to prevail over contrary requirements of any State law, and I hold in this case, over any provisions to the contrary in New York's Abandoned Property Law.[21]

Therefore, I conclude that New York's objections to the enforcement of the Bar Order of this Court, dated September 29, 1966, and to the enforcement of Step VI must be overruled and New York's claim to funds made herein must be *disallowed.*[22]

An order will be entered in accordance herewith.

18. See cases cited in footnote 16.

19. 72 F.Supp. 767 (E.D.N.Y.1947), aff'd sub nom., Public Service Commission of N. Y. v. SEC, 166 F.2d 784 (C.A.2), cert. den., 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948).

20. 153 F.2d 27, 29 (C.A.2), cert. den., 328 U.S. 860, 66 S.Ct. 1350, 90 L.Ed. 1630 (1946).

21. New York also relies upon In re Central N. J. Land & I. Co., 113 N.J.Eq. 332, 166 A. 705 (1933); State by Parsons v. Fidelity Union Trust Co., 25 N.J. 387, 136 A.2d 636, 641 (1957); In re Hull Copper Co., 46 Ariz. 270, 50 P.2d 560, 101 A.L.R. 664 (1935); Realty Associates of Portland Oregon v. Women's Club, 230 Or. 481, 369 P.2d 747 (1961) (en banc); and Honey Mann v. Compania Petrolera Trans Cuba, et al., Misc.2d [Index No. 1172/1960 (Sup.Ct. N.Y.Co.1968)] as authority for the proposition that claims of common stockholders of a corporation upon dissolution (unlike claims of creditors and preferred stockholders) cannot be cut off after reasonable notice. I do not find these cases relevant to the question presented in this case. All of the cited cases involve voluntary liquidation under local law, where the issue was whether unclaimed liquidation distributions on common stock should go to the State by escheat rather than to known stockholders on a tontine principle, or whether a purported cut-off of a late claimant was effective. None of the cases purport to state that federal power to regulate commerce is forbidden from altering liquidation rights which local law may otherwise prescribe. The present case, as I have ruled, involves the reach of a federal statute which itself compels liquidation and the expensive and time consuming search for missing stockholders before cutting them off and redistributing the unclaimed assets. We are *not* concerned in this case, as the cited cases were, with what local law would require to be distributed among stockholders of a corporation in liquidation under local law in the absence of an overriding federal statute.

22. Other grounds were advanced for overruling New York's objections and disallowing its claim, but in view of my holding it is unnecessary to consider the additional grounds.