**In re THOMSON McKINNON SECURITIES INC. and Thomson McKinnon Inc., Debtors.**

**Bankruptcy Nos. 90B 10914, 90 B 11805.**

United States Bankruptcy Court, S.D. New York.

March 7, 1991.

Debevoise & Plimpton, New York City, for Thomson McKinnon Securities, Inc.; Michael E. Wiles, of counsel.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City, for Office of New York State Comptroller; August L. Fietkau, Asst. Atty. Gen., of counsel.

## DECISION ON MOTION FOR ORDER DISALLOWING CLAIM OF NEW YORK STATE COMPTROLLER

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Thomson McKinnon Securities Inc. ("TMSI"), debtor and debtor in possession in one of the above-captioned cases, has moved pursuant to Section 502(a) of the Bankruptcy Code ("the Bankruptcy Code") and Bankruptcy Rules 3007, 9014 and 7012, for an order disallowing, in its entirety, the claim of the Office of the New York State Comptroller (the "State Comptroller"), filed herein on September 19, 1990. The background facts are as follows:

### FACTS

1. On March 28, 1990 TMSI filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. On June 8, 1990, Thomson McKinnon Inc. ("TMI") filed its voluntary petition for Chapter 11 relief. Pursuant to an order of this court, dated June 8, 1990, the bankruptcy cases of TMSI and TMI are being jointly administered for procedural purposes only.

2. TMSI has continued in the operation and possession of its business and property as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3. On September 19, 1990, the Office of the New York State Comptroller filed a proof of claim against TMSI pursuant to the New York State Abandoned Property Law (the "APL") in the amount of $36,657,-551.00 (the "State Claim"). The State Claim seeks payment to the State Abandoned Property Fund of certain funds and securities that were segregated from TMSI's other assets pursuant to a court order dated March 28, 1990 and entitled "Order Authorizing the Segregation and Distribution of Property Held or Received for the Account of Former Customers" (the "Segregation Order"). The State seeks payment to it of any "amounts or securities which cannot be paid to any former customer whose last known address on the books and records of the Debtor was within New York State, due to an inability to locate such former customer."

4. The debtor reasons that the State Claim should be disallowed in full as a matter of law, on the grounds that the State Claim conflicts with the policies and provisions of federal bankruptcy law and of the Segregation Order itself. The debtor

requests that this court exercise its discretion under Bankruptcy Rule 9014 to apply Bankruptcy Rule 7012 to this contested matter, and to expunge the State Claim.

## Prior Events

5. TMSI formerly was a full-service broker and dealer in securities. Prior to the filing date, in anticipation of its impending bankruptcy case, TMSI had ceased all brokerage activities, sold most of its assets and disposed of the vast majority of the customer property in its possession. This included the transfer, in September 1989, of all of TMSI's active customer accounts to Prudential–Bache Securities, Inc. or, at the customers' instructions, to other brokers.

6. Due to the nature of its former business and record-keeping errors, TMSI found that it held cash and securities that it could not match with any firm positions or customer positions recorded on its books. TMSI also held other funds and securities that possibly were subject to future claims by former customers. The funds and securities that fell into these various categories were as follows:

(a) *Outstanding Checks.* Prior to December 8, 1989, TMSI made payments to its former customers through a checking account maintained with Manufacturers Hanover Trust Co. From December 8, 1989 to the Filing Date, TMSI made payments to its former customers through checking accounts maintained with Banque Paribas in New York City. As of March 23, 1990, 3,476 checks in the aggregate amount of $2,045,512.00 were outstanding. Of these checks, approximately 3,000, in the aggregate amount of approximately $1.7 million, had been outstanding for more than nine months.

(b) *Dividends Payable.* As of March 23, 1990, TMSI held $8,565,101.00 in cash and $1,309,760.00 in securities, representing dividends, principal and interest payments that TMSI had received with respect to securities that once were held in TMSI's name, but whose owner TMSI could no longer identify. Some of these dividends might be subject to claims by TMSI's former customers or other brokers, such as where securities were sold but, for one reason or another, were not re-registered in the new owner's name.

(c) *Record-keeping Differences.* Although the institutional accounts formerly maintained by TMSI had been closed or transferred prior to the filing date, in many cases there were unreconciled credit or deficit positions in these accounts as of the transfer date. TMSI's records showed an aggregate equity in these accounts of $1,262,249.00 as of March 23, 1990.

(d) *Patten Securities.* Pending resolution of a litigation between TMSI and Patten Securities, TMSI had frozen certain accounts controlled by principals of Patten Securities, which held $125,606.00 cash and $116,700.00 in securities. The dispute with Patten Securities has since been resolved.

(f) *Accounts with Unidentified Owners.* TMSI possessed $521,607.00 in funds and $375,516.00 in securities in accounts for which no customer's identity or address could be ascertained.

■ 7. Some of these funds and securities might belong to TMSI and the balance would then be subject to valid claims by former customers. Under the provisions of the Securities Investor Protection Act of 1970 ("SIPA"), TMSI's former customers were entitled to priority in their claims to such funds or securities. 15 U.S.C. §§ 78*lll*, 78fff–2. Thus, if the Securities Investor Protection Corporation ("SIPC") had elected to commence proceedings under SIPA, such funds and securities would have been distributed "as promptly as possible" to former customers, 15 U.S.C. § 78fff(a)(1), and prior to any distribution to general creditors. 15 U.S.C. § 78fff–2(c)(1).

8. SIPC informed TMSI that it would commence a SIPA proceeding if such a proceeding were needed to protect the rights of the debtor's former customers to receive funds and securities belonging to them. However, both SIPC and the debtor recognized that a SIPA proceeding would complicate and delay the administration of the debtor's estate and would increase the

cost of administration. This was principally because, under SIPA, a Trustee must be appointed to administer distributions of customer property. 15 U.S.C. § 78eee(b)(3). In order to avoid unnecessary expense and delay, and with the approval of SIPC, the Staff of the SEC, the United States Trustee and the debtor's major creditors, the debtor applied for an order authorizing it to segregate funds and securities sufficient to satisfy any potential customer claims, and to distribute funds and securities to former customers in satisfaction of customer claims on an ongoing basis, just as a SIPA Trustee would otherwise have done.

*The Segregation Order*

9. The court entered the Segregation Order on TMSI's filing date. The Segregation Order authorized TMSI (*i*) to segregate and keep separate from its other assets funds in the aggregate amount of $12,719,402.00 deposited in seven bank accounts at United States Trust Company of New York (the "U.S. Trust Accounts") and (*ii*) to segregate on its books and records securities with an aggregate value of $9,357,921.00 as of March 23, 1990.

10. The Segregation Order provided that these segregated funds and securities (collectively, the "Segregated Property") could be used during the pendency of the bankruptcy case to satisfy valid claims by former customers of TMSI to "customer property" (as that term is defined in 15 U.S.C. § 78*lll* (4)) or "customer name securities" (as that term is defined in 15 U.S.C. 78*lll* (3)). The Segregation Order further provided that TMSI could make distributions and disbursements from the Segregated Property upon the filing by a former customer of a proof of claim in such form as authorized by the Bankruptcy Court. TMSI was directed to file weekly reports with the court, the Creditors' Committee, SIPC and the United States Trustee, describing all distributions of "customer property" and "customer name securities" made during the prior week.

11. On March 28, 1990 the court also entered an Order Setting a Bar Date for Claims of Former Customers and Approving Notice and Proof of Claim Forms (the "Bar Date Order"). The Bar Date Order was revised, on April 3, 1990, to correct certain clerical errors. The Bar Date Order, in conjunction with the Segregation Order, established a mechanism for the uniform resolution of customer claims. The court set October 30, 1990 (the "Bar Date") as the date by which former customers of TMSI were required to file claims to "customer property" or "customer name securities" (as those terms are defined in SIPA) or their claims to such property "shall be forever barred." The Bar Date Order also approved a form of notice and Proof of Claim forms.

12. As directed by the court pursuant to the Bar Date Order, TMSI sent notice, proof of claim forms and instructions by first class mailed to (*i*) all former customers of TMSI to whom checks had been issued, but not presented for payment prior to the filing of TMSI's petition, (*ii*) all holders of open institutional accounts, and (*iii*) all former customers of TMSI who had sent TMSI inquiries regarding property that might constitute customer property. TMSI also caused notice (in a form approved by the court) to be published on three consecutive Mondays in two national, six regional and three foreign newspapers.

13. Pursuant to the Segregation Order and the Bar Date Order, TMSI has been paying valid claims to "customer property" and "customer name securities" on an ongoing basis. Nonetheless, TMSI continues to hold significant amounts of Segregated Property. As of December 14, 1990, TMSI still held cash deposits in the aggregate amount of $12,095,699.00 and segregated securities with a value of $8,460,918.00.

*The State Claim*

14. On September 19, 1990, the State of New York through the Office of the State Comptroller filed a Proof of Claim, which it classified as a priority claim, in the amount of $36,657,551.00. This amount represents the total of the following amounts listed by TMSI in its June 21, 1990 Schedule of Assets and Liabilities:

(a) all cash segregated in the U.S. Trust accounts;

(b) all segregated securities; and

(c) a general entry in the amount of $14,109,517.00 representing an "Accrual for Contingent Liabilities."

15. The State asserts rights to these sums pursuant to the New York Abandoned Property Law, § 510 *et seq.* (McKinney 1944 & Sup.1990) (the "APL"). The APL entitles the State to take custody of funds or securities under certain circumstances, and to hold them as a custodian until the property ultimately is claimed by the rightful owner thereof. APL §§ 510(7), 511. In the interim, the State is entitled to use such property. APL § 102. Owners may make claims to property in the Abandoned Property Fund (with certain exceptions that do not apply here) without any time limits imposed on the making of such claims. APL § 1406.

16. Pursuant to the APL, the State seeks payment to the Abandoned Property Fund of any Segregated Property that cannot be paid "to any former customer whose last known address on the books and records of the Debtor was within New York State, due to an inability to locate such former customer." Consistent with the provisions of the APL, the State Claim further asserts that such amounts or securities will "be held by the Comptroller as custodian of the Abandoned Property Fund until claimed by the rightful owner thereof."

## DISCUSSION

This court must determine whether or not the New York State Comptroller's timely filed claim, bottomed on its New York APL is allowable. There is no question that the State Comptroller is a creditor holding a claim within the meaning of 11 U.S.C. § 101(4), which defines a claim as a "right to payment". An entity that has a claim against a debtor qualifies as a creditor, as defined under 11 U.S.C. § 101(9)(A). The debtor disputes the allowability of the Comptroller's claim on the ground that it seeks to obtain property which was unclaimed by the debtor's customers after the

expiration of the court-ordered six month bar date. Accordingly, the debtor maintains that the Comptroller's claim conflicts with the distribution scheme under the bankruptcy laws and the Segregation Order entered for the protection of the debtor's creditors and customers.

Bankruptcy Rule 3003(c)(3) permits the court to enter a bar order for filing proofs of claims or interests in a Chapter 11 case. The court may fix any period of time which provides creditors or equity security holders with a reasonable time for filing. By order dated March 18, 1990, the court directed that creditors and former customers of the debtor were given six months in which to file their claims. The Bar Date Order also required the debtor to provide notice of the Bar Date by direct mail and by publication in two New York newspapers, as well as by direct mail to former customers and creditors whose addresses were known. There is no question that the debtor complied with the requirements expressed in the Bar Date Order. Bankruptcy Rule 3003(c)(2) also provides that any creditor who fails to file a proof of claim within the time fixed by the Bar Date Order "shall not be treated as a creditor with respect to such claim for the purpose of voting and distribution." Hence, those former customers and creditors of the debtor who failed to file timely proofs of claim lost their rights to claim property from the debtor, with the result that more property became available for distribution to those creditors of the debtor who did file timely proofs of claims. This procedure for filing claims in Chapter 11 cases is set forth in the Bankruptcy Rules, which, in turn, were promulgated pursuant to 28 U.S.C. § 2075 and were adopted by the United States Supreme Court by order dated April 25, 1983. Thus, this procedure dealing with claims reflects a uniform federal policy with respect to their treatment in Chapter 11 cases.

Congress clearly expressed its intention that any remaining unclaimed funds after the Chapter 11 Bar Date should revert to the debtor and may be applied under the debtor's plan for the benefit of the timely

filed claims. This point was expressed in 11 U.S.C. § 347(b) which provides:

(b) Any security, money, or other property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943(b), 1129, 1173, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

In the instant case, the State Comptroller's claim does not reflect a right to payment arising out of any transactions, dealings or contracts between the State and the debtor. Instead, the State Comptroller's claim is derived from the possible claims of the debtor's former customers and creditors whose claims were terminated by the Bar Date fixed under the bankruptcy laws. Therefore, the State Comptroller contends that the property which would have been available under the bankruptcy laws for distribution to those former customers and creditors who had dealings with the debtor, should be awarded to the State "as abandoned property pursuant to the New York State Abandoned Property Law, Article 5A to be held by the Comptroller as custodian of the Abandoned Property Fund *until claimed by the rightful owner thereof.*" (Emphasis added) Thus, those former customers and creditors whose rights were terminated by the Bar Date fixed by the bankruptcy laws, may nevertheless belatedly satisfy their claims under the APL, to the detriment of those creditors of the debtor who did file timely proofs of claims. Manifestly, the State Comptroller's claim, which is premised on the APL, is in direct conflict with the distribution scheme established under the federal bankruptcy laws. In such case, the Supremacy Clause contained in U.S. Const. Art. 6, cl. 2, mandates that federal law supersedes state law. The State Abandoned Property Law must give way to the distribution scheme established under the federal bankruptcy laws. *See In re Stan-*

*dard Gas and Electric Co.,* 301 F.Supp. 1382 (D.Del.1969), *aff'd,* 433 F.2d 139 (3rd Cir.1970).

The State Comptroller places great weight on the holding in *Berry Estates v. State of New York (In re Berry Estates),* 812 F.2d 67 (2d Cir.1987). There, the debtor, an owner of an apartment complex which had been found guilty of charging tenants excessive rents for rent controlled apartments, was ordered by a state court to return to the tenants excess rents. However, during the litigation as to whether or not the debtor collected excess rents, the rents in question were ordered to be held in escrow by the County Clerk. Thereafter, the debtor filed a Chapter 11 case under the Bankruptcy Code. The State Comptroller filed a claim for excess rent on behalf of unknown tenants and those who had moved from the premises before and during the litigation. The Court of Appeals affirmed the lower courts' rulings, except as to the disposition of the unclaimed funds, holding that the funds should not revert to the debtor, but should go to the State Comptroller as abandoned property if not claimed by the tenants within five years from the deposit with the County Clerk. The rationale for this holding was that:

[T]he bankruptcy court was not justified in disregarding the State orders designed to prevent Berry from *profiting from its misconduct.*

\*    \*    \*    \*    \*    \*

Where, as here, *no claims of other creditors are involved,* it would allow a landlord, who has disregarded the orders of the New York courts, to profit by its misconduct, we do not believe that Congress intended such a perverse result when it enacted the Bankruptcy Code in 1978.

(Emphasis added) *In re Berry Estates,* 812 F.2d at 71.

Clearly, the *Berry Estates* case is inapplicable to the instant case, where the debtor has not been found guilty of any misconduct and, therefore, will not profit from any such misconduct. More significantly,

the *Berry Estates* court noted that no claims of other creditors were involved, so that it was simply a case between the State Comptroller, as enforcer of rent control laws on behalf of unknown tenants and the debtor, who sought to profit from its own misconduct. This point was emphasized by the Second Circuit when it said that Congress did not "intend that the bankruptcy court be a haven for wrongdoers." *Id.*

In the instant case, if the State Comptroller successfully asserts the APL in favor of former customers and debtors who have not filed timely proofs of claims and whose interests in property held by the debtor are now terminated by the Bar Order, the result would be to diminish the funds in this estate available for creditors who did file timely proofs of claims. Moreover, in the *Berry Estates* case the State Comptroller stood in the shoes of unknown tenants and was authorized by the bankruptcy court to file a claim on their behalf to protect their interests for a fixed period beyond the bar order which was entered in that case. Here, the State Comptroller does not purport to stand in the shoes of any unknown former customers of the debtor. Instead, the State Comptroller asserts his own interests, premised on the State APL. Although the State Comptroller timely filed a proof of claim and is regarded as a creditor in his own right under the State APL, the claim which he asserts is not in harmony with the bankruptcy laws because it has the effect of doing indirectly that which the bankruptcy laws prevent, namely, permitting barred claimholders to satisfy time-barred claims at the expense of other allowed claims. No part of the State Comptroller's timely proof of claim represents any involvement or dealings between the State and the debtor. Thus, the State Comptroller's status as a creditor of the estate is exclusively bottomed on the State APL, which authorizes the satisfaction of claims for the benefit of creditors whose rights to property of the estate were terminated under the bankruptcy laws. Because the State APL conflicts with the federal bankruptcy laws in its application to the facts in this case, it follows that the State Comptroller's claim cannot be allowed and should be expunged.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 28 U.S.C. 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

2. The claim asserted by the New York State Comptroller, premised on the New York State Abandoned Property Law, conflicts with bankruptcy laws and must be disallowed.

3. The debtor's motion to expunge the New York State Comptroller's claims is granted.

SETTLE ORDER on notice.